4 U.S. 237
 4 Dall. 237
 1 L.Ed. 815
 Attorney-General
v.
 The Grantees under the act of April 1792.
 
 Supreme Court of Pennsylvania.
 September Term, 1802
 ON the 2d of April 1802, an act of the general assembly was passed, entitled 'An Act to settle the controversies arising from contending claims to land, within that part of the territory of this commonwealth north and west of the rivers Ohio and Alleghany, and Conewango creek,' (5 State Laws, 153.) by which the Judges of the Supreme Court were directed to devise an issue, for trying the following questions, at Sunbury, in Northumberland county:
 1st. Are warrants heretofore granted under the act of the 3d of April 1792, valid and effectual in law against this commonwealth, so as to bar this commonwealth from granting the same land to other applicants under the act aforesaid, in cases where the warrantees have not fully and fairly complied with the conditions of settlement, improvement, and residence, required by the said act, at any time before the date of such warrants respectively, or within two years after?
 2d. Are the titles that have issued from the land-office, under the act aforesaid, whether by warrant or patent, good and effectual in law against this commonwealth, or any person claiming under the act aforesaid, in cases where such titles have issued on the authority and have been grounded upon the certificates of two justices of the peace, usually called prevention certificates, without any other evidence being given of the nature and circumstances of such prevention, whereby, as is alleged, the conditions of settlement, improvement, and residence, required by the said act, could not be complied with?
 The judges, having devised and published the form of a feigned issue, on a wager, to try these questions; having given public notice, that all parties interested in the issue would be heard at the trial; and having settled and prescribed the other necessary proceedings; three of them (YEATES, SMITH, and BRACKENRIDGE, Justices) assembled at Sunbury, on the 25th of November 1802; when a jury was impanneled, and the case argued, by the Attorney-General (M'Kean) W. Tilghman, and Cooper, for the commonwealth, in the negative of the propositions contained in the questions; but no counsel appeared to argue, in the affirmative.[1] On the next day, the presiding Judge delivered the following charge to the jury: YEATES, Justice.
 That the decision of the Court and Jury on the present feigned issue should 'settle the controversies arising from contending claims to lands north and west of the rivers Ohio and Alleghany, and Conewango creek,' is an event devoutly to be wished for by every good citizen. 'It is indispensably necessary that the peace of that part of the state should be preserved, and complete justice done to all parties interested, as effectually as possible.' (Close of Preamble to the Act of 2d of April 1802, p. 155.)
 
 
 1
 We have no hesitation in declaring, that we are not without our fears, that the good intentions of the legislature, expressed in the law under which we now sit, will not be effected. We hope we shall be happy enough to acknowledge our mistake hereafter.
 
 
 2
 It is obvious that the validity of the claims of the warrantholders, as well as of the actual settlers, must depend upon the true and correct construction of the act of the 3d of April 1792, considered as a solemn contract between the commonwealth the each individual.
 
 
 3
 The circumstances attendant on each particular case, may vary the general legal conclusion in many instances.
 
 
 4
 We proceed to the discharge of the duties enjoined on us by the late act.
 
 
 5
 The first question proposed to our consideration is as follows:
 
 
 6
 Are warrants heretofore granted under the act of the 3d of April 1792, valid and effectual in law against this commonwealth, so as to bar this commonwealth from granting the same land to other applicants under the act aforesaid, in cases where the warrantees have not fully and fairly complied with the conditions of settlement, improvement, and residence, required by the said act, at any time before the date of such warrants respectively, or within two years after?
 
 
 7
 It well be proper here to observe, that on the motion for the mandamus to the late secretary of the land-office, at the instance of the Holland company; the members of this Court, after great consideration of the subject, were divided in their opinions. The Chief Justice seemed to be of opinion, that if the warrantee was 'by force of arms of the enemies of the United States, prevented from making an actual settlement, as described in the act, or was driven therefrom, and should persist in his endeavours to make such actual settlement thereafter,' it would amount to a performance of the condition in law. Two of us (YEATES and SMITH) thought, that in all events, except the death of the party, the settlement and residence contemplated by the act, should precede the vesting of the complete and absolute estate, and that 'every warrant-holder should cause a settlement to be made on his lands within two years next after the date of the warrant, and a residence thereon for five years next following the first settlement, on pain of forfeiture, by a new warrant; but if, nevertheless, he should be interrupted or obstructed by the force of the enemy from doing those acts within the limited periods, and should afterwards persevere in his efforts in a reasonable time after the removal of such force, until these objects should be accomplished, no advantage shall be taken of him, for the want of a successive continuation of his settlement.' To this opinion Judge BRACKENRIDGE subscribes.
 
 
 8
 It would ill become us to say, which of these constructions is entitled to a preference. It is true, that in the preamble of the act of the 2d of April 1802, (p. 154.) it is expressed, that 'it appears from the act aforesaid, (3d of April 1792) that the commonwealth regarded a full compliance with those conditions of settlement, improvement, and residence, as an indispensable part of the purchase, or consideration, of the land itself.' But it is equally certain, that the true test of title to the lands in question must be resolved into the legitimate meaning of the act of 1792, extracted ex viceribus suis, independent of any legislative exposition thereof. I adhere to the opinion which I formerly delivered in Bank; yet, if a different interpretation of the law shall be made by Courts of a competent jurisdiction in the dernier resort, I shall be bound to acquiesce, though I may not be able to change my sentiments. If the meaning of the first question be, are titles under warrants issued under the law of the 3d of April 1792, for lands north and west of the rivers Ohio and Alleghany, and Conewango creek, good and available against the commonwealth, so as to bar the granting of the same land to other applicants, where the warrantees have not fully and fairly complied with the conditions of settlement, improvement, and residence, required by the law, at any time before, or within two years after, the dates of the respective warrants, in time of profound peace, when they were not prevented from making such actual settlement by force of arms of the enemies of the United States, or reasonable and well-grounded fear of the enemies of the United States? The answer is ready in the language of the acts before us, and can admit of no hesitation.
 
 
 9
 'No warrant or survey for those lands shall vest any title, unless the grantee has, prior to the date of such warrant, made, or caused to be made; or shall within the space of two years next after the date of the same, make, or cause to be made, an actual settlement thereon, by clearing, &c. and in default thereof, it shall and may be lawful to and for the commonwealth to issue new warrants to other actual settlers for the said lands, or any part thereof, & c.' (Act of the 3d of April 1792, sec. 8.) For the commonwealth regarded a full compliance with the conditions of settlement and residence as an indisputable part of the purchase or consideration of the lands so granted.' (Preamble to Act of 1802.)
 
 
 10
 But if the true meaning of the question be, Whether under all given, or supposed, circumstances of peace or war, of times of perfect tranquillity, or imminent danger, such warrants are not ipso facto void and dead in law, we are constrained to say, that our minds refuse assent to the general affirmative of the proposition.
 
 
 11
 We will exemplify our ideas on this subject. Put the case, that a warrant taken out early in 1792, calls for an island, or describes certain land, with accuracy and precision, by the course of waters, or other natural boundaries, distant from any military post, and that the warrantee, after evidencing the fullest intentions of making an actual settlement on the lands applied for, by all the necessary preparation of provisions, implements of husbandry, labourers, cattle, &c. cannot, with any degree of personal safety, seat himself on the lands within two years after the date of the warrant, and by reason of the just terror of savage hostilities? Will not the proviso in the 9th section of the act of the 3d of April 1792, excuse the temporary non-performance of an act, rendered highly dangerous, if not absolutely impracticable, by imperious circumstances, over which he had no controul?
 
 
 12
 Or: Suppose another warrant, depending, in point of description, on other leading warrants, which the district surveyor, either from the state of the country, the hurry of the business of his office, or other causes, could not survey until the two years were nearly expired, and the depredations of the Indians should intervene for the residue of the term, will not this also suspend the operation of the forfeiture? Nothing can be clearer to us, than that the terms of the proviso embrace and aid such cases; and independent of the strong expressions made use of, we should require strong proof to satisfy our minds that the legislature could possibly mean to make a wanton sacrifice of the lives of her citizens.
 
 
 13
 It is said in the books, that conditions rendered impossible by the act of God, are void. Salk. 170. 2 Co. 79. b. Co. Lit. 206. a. 290 b. 1 Roll. Abr. 449. l. 50. 1 Fonb. 199.
 
 
 14
 But conditions precedent must be strictly performed to make the estate vest, and though become impossible, even by the act of God, the estate will not vest; aliter of conditions subsequent. 12 Mod. 183. Co. Lit. 218. a. 2 Vern. 339. 1 Ch. Ca. 129. 138. Salk: 231. 1 Vern. 183. 4 Mod. 66. We desire to be understood to mean, that the 'prevention by force of arms of the enemies of the United States,' does not, in our idea, absolutely dispense with and annul the conditions of actual settlement, improvement, and residence, but that it suspends the forfeiture by protracting the limited periods. Still the conditions must be performed cy pres, whenever the real terror arising from the enemy has subsided, and he shall honestly persist in his endeavours to make such actual settlement, improvement, and residence, until the conditions are fairly and fully complied with.
 
 
 15
 Other instances may be supposed, wherein the principles of prevention may effectually be applicable. If a person, under the pretence of being an actual settler, shall seat himself on lands, previously warranted and surveyed within the period allowed, under a fair construction of the law, to the warrantee, for the making his settlement, withhold the possession, and obstruct him from making his settlement, he shall derive no benefit from this unlawful act. If the party himself is the cause, wherefore the condition cannot be performed, he shall never take advantage. Co. Lit. 206. Doug. 661. 1 Roll. Abr. 454. pl. 8. Godb. 76. 5 Vin. 246. pl. 25.
 
 
 16
 We trust that we have said enough to convey our sentiments on the first point. Our answer to the question, as proposed, is, that such warrants may or may not be valid and effectual in law against the commonwealth, according to the several times and existing facts accompanying such warrants. The result of our opinion, founded on our best consideration of the matter is, that every case must depend on, and be governed by, its own peculiar circumstances.
 
 
 17
 The second question for decision is, Are the titles that have issued from the land-office under the act aforesaid, whether by warrant or patent, good and effectual against the commonwealth, or any person claiming under the act aforesaid, in cases where such titles have issued on the authority, and have been grounded on the certificates of two justices of the peace, usually called prevention certificates, without any other evidence being given of the nature and circumstances of such prevention, whereby, as is alleged, the conditions of settlement, improvement, and residence, required by the said act, could not be complied with?
 
 
 18
 It was stated in evidence on the motion for the mandamus, and proved on this trial, that the board of property being desirous of settling a formal mode of certificate, on which patents might issue for lands north and west of the rivers Ohio and Alleghany, and Conewango creek, required the opinion of Mr. Ingersoll, the then attorney-general thereon; and on due consideration, a form was afterwards adopted on the 21st of December 1797, which was ordered to be published in the Pittsburgh gazette, and patents issued of course, on the prescribed form being complied with.
 
 
 19
 The received opinion of the supreme executive magistrate, the attorney-general, the board of property, and of a respectable part of the bar, (whose sentiments on legal questions will always have great and deserved weight) at that day, certainly was, that if a warrant-holder was prevented by force of arms of the enemies of the United States from making his actual settlement, within two years after the date of his warrant, and afterwards persisted in his endeavours to make such settlement, that the condition was extinguished and gone. Persisting in endeavours, was construed to mean something; attempts, essays, &c.; but that did not imply absolute success, or accomplishment of the objects intended to be effected. By some it was thought, that the endeavours were only to be commensurate as to the time of making the actual settlement, and were tantamount, and should avail the parties 'in the same manner as if the actual settlements had been made and continued.'
 
 
 20
 The decisions of the Court in Morris's Lessee v. Neighman[2] and others at Pittsburgh, May 1799, tended to make the former opinion questionable; and two of the justices of the Supreme Court adopted a different doctrine, in their judgment between the Holland company and Tench Cox.[3]
 
 
 21
 In the argument in that case, it was insisted by the counsel for the plaintiffs, that the board of property in their resolves, and the governor by his patent, represented the commonwealth pro hac vice; and that interests vested under them, which could not afterwards be defeated.
 
 
 22
 We cannot subscribe hereto. If the conditions of settlement, improvement, and residence, are redispensable at all events; they become so by an act of the different branches of the legislature. The governor who has a qualified negative in the passing of laws, cannot dispense with their injunctions; and it cannot be said that this case falls within the meaning of the 9th section of the second article of the constitution. 'The governor shall have power to remit fines and forfeitures, and to grant reprieves and pardons except in case of impeachment.' It relates merely to penalties consequent on public offences. Nor can it be pretended that the board of property, by any act whatever of their own, can derogate from the binding force of law. But the fact is, an intention of dispensing with the law of 1792, cannot with any degree of justice be ascribed to the governor, or board of property, for the time being. They considered themselves in their different functions virtually discharging their respective duties, in carrying the act into execution, according to the general received opinion of the day; they never intended to purge a forfeiture if it had really accrued, nor to excuse the non-performance of a condition if it had not been complied with; agreeably to the public will expressed in a legislative contract.
 
 
 23
 The rule of law is thus laid down in England. A false or partial suggestion by the grantee of the king to the king's prejudice, whereby he is deceived, will make the grant of the king void. Hob. 229. Cro. E. 632. Rel. 48. 1 Co. 44. a. 51. b. 3 Leon. 5. 2 Hawk. 398. Black. 226. But where the words are the words of the king, and it appears that he has only mistaken the law, there he shall not be said to be so deceived to the avoidance of the grant. Per Sir Samuel Eyre, Just. Ld. Ray. 50. 6 Co. 55. b.—56 b. accord. But if any of the lands concerning which the question arises, became forfeited by the omission of certain acts enjoined on the warrant-holders, they do not escheat to the governor for the time being, for his benefit, nor can he be prejudiced as governor by any grant thereof, they become vested in the whole body of the citizens, as the property of the commonwealth, subject to the disposition of the laws.
 
 
 24
 We are decidedly of opinion, that the patents, and the prevention certificates recited in the patents, are not conclusive evidence against this commonwealth, or any person claiming under the act of 3d of April 1792, of the patentees having performed the conditions enjoined on them, although they have pursued the form prescribed by the land-officers. But we, also, think, that the circumstance of recital of such certificates will not ipso facto avoid and nullify the patent, if the actual settlement, improvement, and residence, pointed out by the law, can be established by other proof.
 
 
 25
 We must repeat on this head, what we asserted on the former, that every case must be governed by its own peculiar circumstances. Until the facts really existing, as to each tract of land, are ascertained with accuracy, the legal conclusion cannot be drawn with any degree of correctness. Ex facto oritur jus.
 
 
 26
 2d. Here we feel ourselves irresistibly impelled to mention a difficulty, which strikes our minds forcibly. Our reflections on the subject have led us to ask ourselves this question on our pillows: What would a wise, just, and independent, chancellor decree on the last question? Executory contracts are the peculiar objects of chancery jurisdiction, and can be specifically enforced by chancery alone. Equity forms a part of our law, says the late Chief Justice truly. 1 Dall. 213.
 
 
 27
 If it had appeared to such a chancellor, by the pleadings, or other proofs, that the purchase money had been fully paid to the government by the individual for a tract of land, under the law of the 3d April 1792; that times of difficulty and danger had intervened; that sums of money had been expended to effect an actual settlement, improvement, and residence, which had not been accomplished fully; that by means of an unintentional mistake, on the part of the state-officers, in granting him his patent (the officers not led to that mistake by any species of fraud or deception on the part of the grantee) he had been led into an error, and lulled into a confidence, that the conditions of the grant had been legally complied with, and, therefore, he had remitted in his endeavours therein: Would not he think, that under all these circumstances, thus combined, equity should interpose and mitigate the rigid law of forfeiture, by protracting the limited periods? And would it not be an additional ground of equity, that the political state of the country has materially changed since 1792, by a surrender of the western posts to the government of the United States, and peace with the Indian nations, both which render an immediate settlement of the frontiers, in some measure, less necessary than heretofore?
 
 
 28
 But it is not submitted to us to draw the line of property to these lands; they must be left to the cool and temperate decisions of others, before whom the questions of title may be agitated: We are confined to the wager on the matters before us; and on both questions we have given you our dispassionate sentiments, formed on due reflection, according to the best of our judgment. We are interested merely as common citizens, whose safety and happiness is involved in a due administration of the laws. We profess, and feel, an ardent desire, that peace and tranquillity should be preserved, to the most remote inhabitants of this commonwealth.
 
 
 29
 The jury found a general verdict in favour of the attorney-general, on the feigned issue; and judgment was rendered in these words: 'Whereupon it is considered by the Court here, that the said attorney-general do recover of the said grantees, his damages, costs, and charges, aforesaid, amounting in the whole to two hundred dollars and six cents, and the Court accordingly render judgment thereon for the plaintiff, subject to the proviso in the 9th section of the act of assembly, passed the third day of April 1792.'
 
 
 
 [1]
 The reasons, for not embracing this opportunity to discuss the subject, are assigned by the counsel of the Holland company, in a letter addressed to the Judges of the Supreme Court:
 'Gentlemen.
 'Having attentively considered the suggestions which were made yesterday, during the conference at the chambers of the Chief Justice, on the subject of the act of the general assembly, passed at the last session, with a view to settle the controversies arising from contending claims to lands north and west of the rivers Ohio and Alleghany, and Conewango creek, we beg leave briefly to submit the result, as a justification for the advice that will be given to our clients.
 '1st. Although the Holland company and their counsel cannot approve the terms of the preamble of the act, by which the legislature has undertaken to declare the meaning and construction of the original contract (the very point in controversy) and though they cannot admit the right or propriety of dictating a new, and, perhaps, unconstitutional mode, of settling a judicial question, without the assent of all the parties in interest; yet they feel the importance of an early decision, and would cheerfully concur in any form of proceeding, by which the merits of the case could be fully and fairly investigated and decided.
 '2d. The merits of the case on the part of the Holland company, as disclosed to the Supreme Court on the motion for a mandamus, and as presented to the legislature, evidently involve the following considerations: 1st. Whether the company have complied with the condition of the 9th section of the act of April 1792? 2d. Whether the reasons assigned for a non-compliance with the condition, bring their case within the proviso? 3d. Whether the proviso operates upon cases that are brought within its terms, to discharge the condition entirely, or only to enlarge the time for performing it? 4th. Whether the company have so persisted in their endeavours to perform the condition, as to be still within the benefit of the proviso? And, 5th. Whether the government, by prescribing the evidence, on which patents had actually issued, in cases brought within the proviso, could now take advantage of the forfeiture, for a supposed non-compliance with the original condition?
 '3d. But the questions which the legislature has proposed are the following: 1st. Are warrants heretofore granted under the act of the 3d day of April 1792, valid and effectual in law against this commonwealth, so as to bar this commonwealth from granting the same land to other applicants under the act aforesaid, in cases where the warrantees have not fully and fairly complied with the conditions of settlement, improvement, and residence, required by the said act, at any time before the date of such warrants respectively, or within two years after? 2d. Are the titles that have issued from the land-office under the act aforesaid, whether by warrant or patent, good and effectual in law against this commonwealth, or any person claiming under the act aforesaid, in cases where such titles have issued on the authority, and have been grounded upon the certificates of two justices of the peace, usually called 'prevention certificates,' without any other evidence being given of the nature, and circumstances of such prevention, whereby, as is alleged, the conditions of settlement, improvement, and residence, required by the said act, could not be complied with? These questions, in our opinion, exclude an investigation and decision upon any other point than the following: 1st. Whether, if the Holland company have not performed the condition, on which the warrants originally issued, within two years,
 though the residence could not be completed till the expiration of five years, the state is barred from granting the same lands to other applicants? and, 2d. Whether patents having issued on the evidence of prevention certificates alone, they are not void, so as to authorise the state to sell the same land to other purchasers?
 '4th. On the first of these points, we observe, that it has never been contended, that the Holland company have performed the condition within two years; but only, that the condition was discharged, or suspended, by the operation of the proviso, on the facts of their case; particularly the fact that an Indian war existed for several years, beyond the term of two years specified in the act of assembly. And on the second point, it is sufficient to say, that although the prevention certificate was the evidence prescribed by the public officers, and ought, therefore, to be binding on the government, yet that even waiving that objection, the patentees will be deprived of their land, when other satisfactory and legal evidence was, and is, in their power, to prove the circumstances which entitled them to patents.
 'Without recurring to the many other obvious objections to the form and provisions of the act of assembly, we are confident that the view which has been offered upon the subject, will justify our advising the Holland company to decline becoming a party to the suit proposed to be instituted; since, we repeat, a decision on the two abstract questions proposed by the legislature, would still leave untouched and undecided, the great and essential part of the controversy.
 (Signed)
 'J. INGERSOLL,
 'W. LEWIS,
 'A. J. DALLAS
 'Philadelphia, June 24, 1802.'-
 
 
 [2]
 See ante. p. 209.
 
 
 [3]
 See ante. p. 170.