## Barnes *against* Irvine.

He who enters upon land north and west of the Ohio and Alleghany rivers and Canawango creek, for which a warrant had previously issued and a survey been made, without first procuring a vacating warrant, is an intruder; and in an action of ejectment by the warrantee, the latter is entitled to recover, although he had not made an actual settlement upon the land within two years from the date of his warrant.

ERROR to the common pleas of *Warren* county.

This was an action of ejectment by Callender Irvine against Sala S. Barnes, for a tract of land in Warren county.

The plaintiff claimed under a warrant to William Irvine, dated the 25th of April 1792, for which the purchase money was then paid in part. Upon the death of the warrantee the land descended to his heirs, who, in 1824, conveyed to the plaintiff. A survey was made on the 14th of April 1830, which was returned and accepted on the 11th of October 1830. On the 6th of October 1831, the balance of the purchase money was paid. No settlement had ever been made upon the land by the plaintiff or those under whom he claimed in pursuance of the requisitions of the act of the 3d of April 1792.

On the 12th of May 1831, the defendant entered upon the land, and on the same day built a house sixteen feet square and without a chimney; the plaintiff's agent called upon him, and he declared that he had but stopped there for a temporary purpose, on his way down the river; on the same day he told others that he intended to make an actual settlement, and on the 16th of May 1831, he declared to

V.—3 N

[Barnes v. Irvine.]

plaintiff's agent, that he claimed the land.   This suit was brought
on that day.

The court below, (Shippen, President,) directed a judgment for
the plaintiff.

The cause was argued at October term, 1835.

*M'Calmont* and *Thompson*, for plaintiff in error.
*Pearson* and *Banks*, for defendant in error.

The opinion of the Court was delivered by

Gibson, C. J.—My brother Rogers and myself came with ex-
treme reluctance, to the conclusion pronounced in Campbell *v.* Gal-
breath.   We anticipated, what has since been too faithfully realised,
that it would open, to a ruinous extent, the sources of litigation
that had been closed by the decision in Skeen *v.* Pearce.   But,
though we concurred in the judgment, we concurred in only one of
the reasons for it.   To trace the point of our partial divergence
then, and to develope the reasons of our entire departure now, re-
quires a statement of the positions that were conceded or assumed.
It was explicitly conceded by at least a majority, (Mr Justice Ross
taking no part,) that by the true construction of the act of 1792,
the purchase money was the principal consideration of the grant,
while the consideration of settlement was a subordinate one and a
condition subsequent; that to divest the title conferred by the war-
rant, required an entry on behalf of the state; and that the appointed
form of authority for it, was a vacating warrant.   Whatever points
of difference there may have been in other respects, this construc-
tion had been given in every instance, and we concurred in its pro-
priety.   It had also been held, that vacating warrants might issue
to those who were not actually settled, and consequently that an
entry by a third person, being unnecessary to qualify him for a new
grant, was not sanctioned by implication; but the propriety of this
construction, on primitive grounds, was more than doubted; not,
however, by all.   More than one of us thought with our predeces-
sors, that the words "*other* actual settlers," implied too strongly to
be mistaken, that the new grantees were to be in all respects such
actual settlers as were their precursors in the original warrants, who
are described in the second section, as "persons who *will* cultivate
and settle;" and in the third, as persons "who may have settled and
improved, or are desirous to settle and improve."   Had the con-
struction been conceived to stand on judicial decisions alone, the
same majority would have adhered to it on the foundation of au-
thority; but certain statutes were produced as instances of legisla-
tive departure from it, by which it was supposed that settlers were
authorized to enter without vacating warrants; to wit, the acts of
the 22d of April 1794, of the 22d of September in the same year;
of the 2d of April 1802; and of the 3d of April 1804.   By all of
us, unfortunately, the act of 1802 was thought to have the effect

[Barnes v. Irvine.]

attributed to it, while we stood equally divided as to the others. Granting, then, that the mode of authorizing entries was not provided for as a cardinal point of the contract and guarded by the constitution, our principal business in reviewing our former opinion will be with the legitimacy of arguments drawn from these statutes.

The second of these is but an extension of the principle of the first to the whole state; and the two may be treated as consubstantial. By the act of 1794, then, it was enacted that applications for unimproved land in the new purchase, should no longer be received; and that no warrant should issue after the 15th of June ensuing, except to a settler or improver. This statute, so far as it goes, seems to be a disabling, and not an enabling, one. It made settlement a condition precedent to the vesting of title by warrant; but it certainly gave a settler no express authority, as the representative of the state, to enter on land already granted, in order to qualify himself for a vacating warrant; nor can it be supposed that such authority was intended to be created by implication. Had the ·legislature meant to confer it, they would have said so in terms, instead of intimating it by what is at best but remote and obscure deduction. To prescribe a rule by terms so vague, would be a vicious form of legislation. The argument attempted is, that vacating warrants without settlement, were necessarily included in the prohibition; and that as the state could not, herself, become a settler, or be supposed to have relinquished her right to the forfeiture, she must, to prevent it from being a *caput mortuum* in her hands, be taken to have transferred it to whoever should choose to enter under her title. The first remark suggested by this hypothesis is, that it rests on a supposed intent to legislate for her right of entry, when, by the construction of our own court it was unborn; when by that of the supreme court of the United States it was stillborn; and when by any possible construction whatever, it could in any case have been but nineteen days old. In very many instances, even the two years from the date of the warrant had not elapsed. That the actual purpose was not to dispense with vacating warrants, is evinced by the subsequent extension of the principle to parts of the state where they had not been prescribed; and that it was not thought to favour the settlers, is apparent from the insertion of the clause to save them from harm by it. It is entirely compatible with truth to say it was intended for land directly in the market, and not for contingencies, such as public rights of entry, which are not subjects of grant at the common law. The real, as well as the ostensible, purpose was not to alter the incidents of contracts already concluded, but to change the conditions of purchase in respect to land still unappropriated. Why, therefore, recur to the inchoate rights of the state in order to satisfy enacting clauses that may be fully satisfied with what she possessed in full property? or say that rights resulting from forfeitures were not left subject to the provisions of the original act? Were we even compelled to say that vacating warrants were

intended to be abolished, it would be more reasonable to presume the state had waived the condition in favour of one who had paid, than enforce it in favour of one who was to pay nothing, or even in her own favour if it were considered that the new grantees were to pay her over again.   Such a waiver would be neither unreasonable nor unprecedented.   By the terms of the land office, in 1769, the locations were to be void if not followed up by survey in six months, and payment of purchase money in twelve; yet these conditions had been so uniformly relaxed as to induce a declaration, in Biddle *v.* Dougal, 5 *Binney* 142, that the courts would have restrained the proprietary from insisting on the forfeitures.   But though it would have been more reasonable, had either been necessary, to presume that the state had relinquished her hold on the land altogether, yet I mean not to intimate an opinion that she did so in fact.   Her subsequent legislation to be presently noticed, shows that she did not.   But thus retaining it, we are compelled to think she meant to enforce it by the means appointed in the original act, rather than by a substitute barely within the license of the constitution.   Even had legislation been necessary to make it effective, it is improbable that it wou'd have been provided in advance of the exigence.

This construction is fortified, rather than weakened by the act of 1802, considered in relation to its object.   Detached parts of it undoubtedly give a specious appearance to the argument on the other side; in fact it was a mutilated reprint of the fourth section, which led to the judgment in Campbell *v.* Galbreath.   But so far was the legislature from eschewing the construction of the courts, that the exclusive aim of this legislature was to obtain it.   It was said in the preamble, that applications for new warrants were made on a supposition that the originals were barred; that legislative protection was sought by the settlers, and opposed by the warrant holders; and that the questions of law and fact which had arisen under the original act, ought to be speedily determined, "*for direction of the officers of the land office,*" as well as to settle the dispute between the persons in possession and the grantees.   To effect this, the judges of the supreme court were directed to determine whether warrants whose condition of settlement had not been performed, were effectual to bar the state from granting the land to other applicants; and to try the validity of titles founded on prevention certificates without further evidence of settlement.   By the fourth section, which was thought by us to be conclusive, the secretary of the land office was directed to grant no new warrants for land already taken up, in order as it was said, to prevent confusion and law suits from conflicting titles; but to file the applications and cause a duplicate copy indorsed with the name and time of presentation, to be delivered to the applicant.   The application was to be founded on actual possession proved by the oath of a witness who was required to specify the time of its commencement; in which circumstances they were to have the same effect as to priority, as if the warrants

[Barnes v. Irvine.]

were then issued. To a person unacquainted with the business of the land office, and especially to one who had not the rest of the section before him, it would naturally seem from this that the legality of an intrusive settlement was permanently recognized as a foundation for an application to have the effect of a vacating warrant. Far otherwise. " And should the decision of the court and jury," it was further provided, " be *in favour* of the claims of the actual settlers, the secretary of the land office shall *proceed to grant the warrants*, upon the purchase money being paid, according to the priority of the applications filed in his office." This key to the whole matter, is unaccountably omitted in Mr Purdon's Digest; and what was in fact a contingent provision, appears there as a positive one. The professional mind had long ceased to be familiar with the subject; and that, together with the fact that the omission in the professional manual had not been noticed at the argument, must stand for the only excuse we can make for our misconception of the drift of the act. By putting the omitted clause to the rest of the section, it is seen at a glance that so far was the legislature from sanctioning settlements on warranted land, their legality was explicitly questioned and the practice of issuing warrants on them suspended till it should be sanctioned by the supreme court. It is known that the expected sanction was not obtained. The contingency on which the provision was to take effect, did not happen, and the whole statute having performed its office by the trial of the feigned issues, became obsolete.

The act of 1804, said in Jones *v.* Anderson, 4 *Yeates* 376, to afford a strong legislative construction in favour of the necessity of vacating warrants, was then passed; and with an evident view to facilitate the procurement of that definite judicial construction which had been found, at the trial of the feigned issues, to be unattainable by the decision of abstract propositions. The secretary of the land office was not directed to resume the practice of issuing warrants on the applications; but, for purposes of trial in the ordinary way, the applications were put on the footing of vacating warrants *for the space of two years;* and it was provided that the settler should have the same right to plead and make proof of his settlement as if a vacating warrant had actually issued; but this without determining that he had any right at all. This last was doubtless inserted to provide for the contingency of a construction requiring vacating warrants, like originals, to be founded on settlements under the acts of 1794. But to preclude every supposition of an intent to disturb existing titles, it was expressly provided that nothing should be " construed to impair any contract or agreement, nor to bar the legal or equitable claims of any person to said lands, nor to release said lands from the conditions of settlement, residence, improvement, purchase money, and interest required by the aforesaid act of the 3d of April 1792, nor to the granting of any lands heretofore reserved or appropriated by law." This statute was continued in force by a supplemental act till the

1st of April 1807, when it was suffered to expire and, like its predecessor, to become obsolete. The contest was over, and shortly afterwards publicly given up by the counsel who had managed it for the settlers. How this temporary expedient could be viewed as a permanent measure to impart to settlements the qualities of vacating warrants without restriction, when the like effect was given to applications founded on such settlements but for a period of two years, I am at a loss to conjecture. As vacating warrants might have been decided to require the basis of a settlement, no other cases could have been safely provided for; but that question like every other one under the original act, was to be left to the judiciary.

These are the acts which have been supposed to evince a departure from the established judicial construction; and if the inquiry rested even here, it would be seen that the foundation of Campbell *v.* Galbreath entirely fails. But it conclusively appears by acts of legislation more recent, that the state has always considered herself as holding the power to control the question of entry and forfeiture. The assertion of this power was signally evinced in the act of the 20th of March, 1811, for purposes of composition between the two classes of litigants. As inducement to that end, she agreed to relinquish her right to enter whenever a warrantee should have compounded with a settler who had entered adversely and made the settlement required by law; and the other provisions are framed on the same principle. For what purpose this concession, if there was nothing to concede? She certainly thought she had not already given every thing to the settlers. Of this, every lingering doubt is dispelled by the concluding clause of the twelfth section alone, by which it was enacted " that nothing contained in the foregoing shall be construed to prevent the commonwealth,' at any time hereafter, *from asserting her right in cases of forfeiture* under the act of the 3d of April, 1792, where the warrantee and actual settler shall fail to embrace the provisions of this act." After this, it will not be pretended that the legislature had considered a naked settler as invested with the rights of the state.

The act of the 14th of March 1814, which took away a part of each tract from the warrantee, and gave it to the settler, was an act of power not professedly founded on any principle in contest here; and the act of the 3d of April 1833, which closed the legislation on the subject, released the condition of settlement, not to the settler, but to the warrantee. It would, therefore, be impossible to maintain, that the stream of legislation has not uniformly flowed in the channel marked out by judicial construction; and' the question is, whether we shall go with it, or against it, by following out the principle of Campbell *v.* Galbreath. That case stands opposed in bold relief to Skeen *v.* Pearce, which had not, as inaccurately supposed, been overruled in Albert *v.* Riddle, 14 *Serg. & Rawle* 841. It was indeed ruled in the latter, that a patent founded on an application without a vacating warrant, may go to the jury; but the decision was

put expressly on the principle which makes way for the deed of every grantor who had a spark of title, and leaves its effect to the direction of the court, just as the same principle had been decided in Young *v.* Beatty, 1 *Serg. & Rawle* 75. Nor will it appear, except by wresting particular expressions from the sense in which they were used, that there had been a discrepance of opinion in respect to the necessity of an entry on the part of the state to re-acquire the title she had granted, before it could again move from her; or in respect to the authority of a naked settler to make such an entry. It is impossible to see how there could be a descrepance. If, as was said in Huidekoper *v.* Douglass, 3 *Cra.* 70, the grants of the state are to be governed by those well established principles which regulate contracts generally, it will inevitably result that settlement and residence constituted a condition subsequent. By any other construction, a warrantee prevented from performing it by intrusion, would have lost the land for want of a title to protect his entry; for prevention even by an act of providence, not particularly excepted, defeats a grant on a condition precedent; and here, the exception extended but to prevention by death or the public enemy. How there can be even a statutory grant on an intermediate condition which belongs decidedly to neither class, it is the business of those who assert it, to explain. A title which vests and does not vest, presents a juridical problem which I pretend not to solve. By the common law, a title which vests at all, remains in the grantee though it be defeasible, till it is divested by matter subsequent. An improver has a vested title, perfectly available though inchoate, from the first stroke of the axe. But he may abandon it; and why may not a warrantee? Simply because he has paid his money. An improver or a locater paid nothing, and therefore might abandon; but all the authorities agree, that though a warrantee may forfeit priority of survey by negligence, an abandonment of the contract is not to be imputed to him. It was probably a misapplication of the doctrine of improvement, with which the people had been familiar, without regard to the fact, that the state having received the principal consideration, might dispense with the subordinate one, which engendered the notion as expressed in the language of the day, that the warrants were dead. The analogy might have been preserved, had it been possible to interpret the terms of settlement and residence as a conditional limitation, determining, as such a limitation does, the estate granted without entry or other act done; but that interpretation was precluded by the direction to proceed by a vacating warrant. It is of little importance that the instrument of avoidance, was not called by that name in the original act. A writ of *fieri facias* would be quite as effective in its consequences, though it were called by any other name. It is sufficient, that instead of an ordinary warrant for unappropriated land, the act of divesture was specifically described, and made equivalent in its consequences to an entry. It was, in fact, to be an authority for the new grantee

to enter as the statutory assignee of the state; and its effect in declaring the forfeiture was to be analogous to an inquest of office. Its nature might, perhaps, have been better indicated, by calling it a warrant of avoidance, or of disaffirmance; but it is enough, that the subject of the original grant was not to fall back, without it, into the mass of unappropriated land, by the fact of non-performance; and that a specific delegation of power was made necessary, to authorize an entry. What did the courts decide? That an entry without the appointed authority, did not determine the title; but that the fact of intrusion did not disqualify the intruder for a new warrant. If, then, the title could be divested but by the appointed means, it mattered little at what time the settler had entered. If, within the two years, his possession could not defeat the grant, because the title vested by the warrant; and if he entered afterwards, it could be divested but by a new and specific grant. He would be an intruder still. When, therefore, this court decided the former of these propositions, it virtually decided the latter also; and the principle of Skeen *v.* Pearce was so palpably in unison with the previous decisions, that it could not have been decided differently, without overruling them. The report of that case, is certainly deficient in circumstances, by reason of the papers having been mislaid; but, I remember the particulars of it well. It was a writ of error to the common pleas of *Butler* county; and the point which arose abstractively on the charge, being argued by Mr Baldwin for the warrantee, and Mr Forward for the settler, was maturely considered, and decided by a full bench, whose unanimous opinion was delivered by a judge pre-eminently distinguished for experience in the principles of our land titles, and on the accuracy of whose knowledge, in this particular, I would as confidently rely, as on that of any man now on the bench or at the bar. It may be remarked, too, that a bias, unfavourable to the settlers cannot be imputed to the Chief Justice, who had been of counsel with them when at the bar, and argued for them in the case of the Attorney General *v.* The Grantees, 4 *Dall.* 237. But, even if the decision were deemed unworthy of passing respect for its intrinsic merits, it might be a question, whether it had not become a rule of property, by the lapse of eleven years, and transfers on the faith of it. And for whom was it to be shaken? Not for those who had exposed themselves to peril in interposing a line of settlements between the rest of the state and the common enemy, for it is a postulate of their argument, that they did not enter till two years after the pacification by the treaty of Fort Grenville; nor even for many of those who had expended their labour in improvements; for the dispute had long been at rest, and most of the original settlers had compromised, and made their peace. It was, in fact, for those who might enter on land held by warrant for forty years, and doubly paid for in taxes, on pretence of performing a condition for the state, to which she had become indifferent. That numbers immediately entered on the lands of their neighbours, in-

[Barnes v. Irvine.]

tending to hold them by that decision, and that the mischief was arrested only by the arm of the legislature, is matter of recent history. What remains to be done, in order to eradicate the entire evil, is to re-assert the principle of Skeen *v.* Pearce, and apply it to the intermediate cases.

It appears in the case before us, that the plaintiff is the owner of a warrant specifically descriptive of the land, dated the 25th of April 1792, and surveyed for him on the 14th of January 1830; and that the defendant entered on the 12th of May 1831, for purposes, as then declared, of temporary occupancy, but in fact, to claim as an actual settler. On these facts, judgment was properly rendered for the plaintiff.

Judgment affirmed.