# Campbell *against* Galbreath.

In order to establish the ownership of a warrant in the name of another, it is competent for a plaintiff, in ejectment, to prove that they under whom he claims, took it out of the office ; put it into the hands of the deputy surveyor ; employed chain carriers, &c. ; procured the survey to be made, and paid the expense thereof: without first proving that they had paid the purchase money for the warrant.

A plaintiff having thus established the ownership of a warrant to be in three individuals, who were partners, it is competent for him to give in evidence the declarations of one of them, made at an early period, that another of the firm was duly authorized to act for himself and his partners, in procuring a settlement of the land to be made : and after this was proved, an agreement, in writing, between such partner, and one who contracted to settle, may be given in evidence : the settlement not having been made by such contracting party, it is competent to give in evidence his declarations, made at the time, that he contracted for his son, who did make the necessary settlement and improvement.

An action of ejectment may be maintained in the name of the warrantee, although he may have no beneficial interest in the land, and may not have known of the institution of the action.

A, having procured a warrant for land " lying north and west of the rivers Ohio and Alleghany, and Conewango creek," in pursuance of the act of 3d April 1792, did not comply with the conditions of that act, in making a settlement within two years; but, after the lapse of that time, he commenced a settlement and improvement. B, immediately after, also commenced a settlement and improvement upon the same land, which he continued, and subsequently obtained a vacating warrant from the commonwealth, reciting the fact that A had not complied with the terms of the act. In an action of ejectment between parties holding these conflicting titles, it was held, that A's previous settlement, although not within the two years, gave him the better title : and the fact of his settlement not having been persevered in, was sufficiently accounted for by the interruption and threats of B.

WRIT of error to the common pleas of *Mercer* county.

This was an action of ejectment by *Josiah Galbreath* against *Thomas Campbell*, for four hundred acres of land, lying north and west of the river Alleghany and Conewango creek.

The plaintiff gave in evidence a warrant to *Josiah Galbreath*, for four hundred acres, dated 31st March 1794, and a survey in pursuance thereof, made 26th October 1795, embracing the land in dispute : that an improvement and residence were made on the land by *George W. Fell*, as early as the spring of 1798, but which were commenced more than two years after the 22d December 1795, when the hostility of the Indians ceased to prevent settlement. The plaintiff then offered to prove, that the warrant in the name of *Josiah Galbreath*, was taken out by *Walker*, *Probst* and *Lodge*, who put it into the hands of the surveyor, employed the chain carriers, and paid all the expenses of making the survey. The defendant objected to this evidence, and the objection was overruled and exception taken. The plaintiff then offered to prove the declarations of *Lodge*, made in 1797, and often after, that *John Walker* was a partner of his and *Probst* in this and other lands, and was the agent

[Campbell v. Galbreath.]

of the firm of *Walker, Probst* and *Lodge,* with authority to make contracts for the settlement and sale of the land. This evidence was also objected to by the defendant; the objection was overruled, and exception taken. The plaintiff then offered in evidence an article of agreement between *John Walker* and *William Fell,* by which the title of *Walker, Probst* and *Lodge* was vested in the said *William Fell;* this evidence was also objected to; the objection was overruled, and exception taken by the defendant. The plaintiff then further offered to prove the declarations of *William Fell* and *George W. Fell,* made at the time, that the settlement and improvement made by *George W. Fell,* was under his father, and in pursuance of the agreement with *Walker.* This evidence was also objected to by the defendant, and the objection was overruled, and exception taken.

The defendant then proved that a settlement and improvement were made on another part of the land in dispute, in 1798 or 1799, but after the improvement of *George W. Fell* had commenced, by *Alexander Hamilton,* who sold his right to *Thomas Campbell,* the defendant, in the fall of 1799 or spring of 1800. *Campbell* took possession of the land, and continued the settlement and improvement. On the 26th January 1805, *Campbell* procured a *vacating warrant* to himself, for four hundred acres of land, interest from 1st April 1798, reciting the warrant to *Josiah Galbreath,* and vacating it for default of settlement; a survey was made in pursuance thereof of three hundred and eighty-four acres on the 8th March 1805, and a patent issued on the 26th August 1806, to *Thomas Campbell.* The defendant then gave evidence to prove, that no improvement or settlement of the land had ever been made by *Josiah Galbreath.* The defendant now called upon the plaintiff's counsel to say for whose use this suit was brought. Mr *Banks* replied, that he appeared for *George W. Fell;* Mr *Bredin* replied that he appeared for the heirs of *Lodge;* and Mr *Foster,* who was also counsel for the plaintiff, declined to make any reply. The defendant's counsel then proposed to examine Mr *Foster,* for the purpose of showing, that no one was employed by *Josiah Galbreath* to bring the suit, and that such a person was not known to them. The plaintiffs objected to this evidence, and the objection was sustained for the following reason, assigned by the court. " The evidence is immaterial, inasmuch as the counsel, throughout the trial, have said, that the suit is in the name of *Josiah Galbreath,* the warrantee, whom they consider as the trustee for those who have the real interest." To this opinion exception was taken by the defendant.

Some proof was then given by the plaintiff of angry threats made by *Hamilton* to *Fell,* in 1799; what he would to him, if he caught him on the land in dispute. The plaintiff requested the court to charge the jury on the following points :

1. That the entry made by *Thomas Campbell,* and those under whom he claims, into the land granted by warrant, and surveyed to

the plaintiff, was tortious, and not rightful, and that he can derive no benefit from this tortious act.

2. That a vacating warrant, afterwards granted to *Thomas Campbell*, for this land, does not, by relation, make his entry rightful.

3. That the entry and settlement of *Thomas Campbell*, and those under whom he claims, on the land surveyed to the plaintiffs in pursuance of his warrant, excuse any settlement on the part of said plaintiff, and do operate and inure to his use, as if made by himself, or those claiming under him.

4. That *Alexander Hamilton*, (if the jury believe the evidence) having prevented those claiming under the plaintiff, by threats of violence, from making and continuing a settlement on the land, neither he, nor those claiming under him, can take advantage of the want of settlement.

And the defendant requested the court to charge the jury,

1. That in order to make the title of the plaintiff good, it was necessary for him to make, or cause a settlement to be made on the land, within two years after the pacification with the Indians, 22d December 1795.

2. That in default of such settlement, the state had a right to issue a vacating warrant to another actual settler.

3. That if the jury believe that *George W. Fell* entered on the land, for the purpose of making an actual settlement for the use of the warrant holders, after the entry of another adverse settler, yet if he did not remain for the time, and clear the quantity of land required by law, it is such a settlement as could be abandoned ; and if he did not pursue his settlement with reasonable diligence, the party under whom the defendant claims in this case had a right to hold possession, complete his settlement, and take out a vacating warrant.

4. That the testimony of *Benjamin Stokeley* does not show the interest in the warrant to be in *Benjamin Lodge;* and that any contract made by him, or any one under his authority, does not show and establish a contract under the warrant, and that a settlement made under such a contract, is not made under *Josiah Galbreath*, but adverse to him, and will not affect the right of the vacating warrant.

5. That if the jury believe that *Josiah Galbreath* never paid the purchase money for the warrant, never received it from the land office, or had it in possession, or exercised any acts of ownership over it, he is not such an owner or trustee as can support an ejectment, and has not, and never had, any right either legal or equitable to the land.

6. That if the jury believe that *Josiah Galbreath* is a mere fictitious person, this ejectment cannot be supported in his name.

7. That if the jury believe that the settler entered and commenced his settlement with the view and intent to follow up his entry, by obtaining a vacating warrant, the warrant afterwards issued confirmed his original entry, and made it legal and valid.

[Campbell v. Galbreath.]

*Shippen, President,* was of opinion that the evidence contained in the several bills of exception should have been rejected, but the same having been received, except the last, by the associates, he was of opinion the plaintiff was entitled to recover, and so instructed the jury, who found a verdict accordingly. To which opinion exception was taken by the defendant.

The opinions of the court, admitting and rejecting the evidence contained in the several bills of exception, and in the answers to the several points of the plaintiff and defendant, were assigned for errors, and argued by

*Pearson* and *Ayres,* for plaintiff in error.
*J. Banks,* for defendant in error.

The opinion of the Court was delivered by

KENNEDY, J.—The first error assigned, is an exception to the opinion of the court below, in admitting the counsel for the defendant in error, who was the plaintiff below, " to prove, that *Walker, Lodge* and *Probst* took out the warrant given in evidence by the defendant in error, with other warrants, put them into the hands of the deputy surveyor, procured the surveys to be made, and paid the deputy surveyor, employed chain carriers, blasers, &c., and paid them." This evidence was offered to show that *Walker, Lodge* and *Probst* were the owners of the warrant, and to rebut the presumption of law, that every warrant granted for land belongs to the warrantee therein named. I think that the evidence was admissible for this purpose. It is objected, that inasmuch as it was a warrant, and not a location, that the purchase money must have been paid by the party taking it out of the land office, and that therefore the offer ought to have been accompanied with proof of their having paid the purchase money on the warrant, otherwise the proof offered was still deficient. This objection appears to be rather critical; for the offer in its terms was, " to prove that *Walker, Lodge* and *Probst* took out the warrant." Now if this could not be done without their paying the purchase-money for the land, does not the offer necessarily imply the offer of proof, among other things, that they had paid, &c. ? But if it were not so implied, the evidence was still admissible; and in the absence of all rebutting circumstances, might be sufficient to satisfy the jury that *Walker, Lodge* and *Probst* were the owners of the warrant. *Evans* v. *Nargong,* 2 *Binn.* 55; *Cox* v. *Grant,* 1 *Yeates* 166 ; *Taylor* v. *Ewing,* 2 *Yeates* 119. In *Cox* v. *Grant* the court speak of *applications* and *warrants* indiscriminately, and make no distinction as to the nature of the proof that is required or admissible to prove the ownership thereof to be in a person different from the locatee or warrantee named in the application or warrant.

Superintending the survey or paying the fees, has generally been deemed sufficient evidence of ownership of an application, unless rebutted by evidence that the person so superintending or paying acted

K

[Campbell v. Galbreath.]

as agent; or unless possession or some act of ownership appeared in favour of the person in whose name the application was entered. *Cluggage* v. *Duncan,* 1 *Serg. & Rawle* 117. Now, since in practice, as well as in the nature of the transaction itself, the same acts are as strongly indicative of ownership in the case of a warrant as in that of a location, it appears to me that the court was right in overruling the objection. Even the payment of the purchase money into the treasury of the state, is far from being conclusive evidence that the person by whose hand it was paid is the owner of the warrant; for the money may have been furnished to him by another, for whose use he undertook to pay it in. Although, from the late practice of the land office, in keeping an account of the names of the persons respectively by whom the moneys are paid for land warrants, it may be that in most cases it would appear from their books by whom it was paid or handed into the office; yet I have no doubt but that there are many cases in which it does not appear; and to establish the rule contended for by the plaintiff in error, would compel the party, as often as that should happen, to be at the expense and trouble of getting some one from the land office to attend on the trial as a witness, to prove that it did not appear upon the books or accounts kept in the land office from whose hand the purchase money for the warrant had been received; or otherwise to have his deposition taken under a rule of court for that purpose, which I think has never been required, nor yet introduced into practice. I say it would impose this burthen upon the party; because a certificate from the officer in whose care such books were to that effect, being merely of a negative character, would not, as I conceive, be admissible in evidence. Besides, such an entry in the books, even if it existed, would only be presumptive evidence at best, and corroborating or rebutting, just as it might happen to show that the purchase-money was paid by the party claiming to be the owner of the warrant, or to have been paid by some other. If it showed the former, it would be corroborating, when preceded by evidence of the same party having superintended and directed the surveying of the land, and of his having paid the fees and expenses of the same; but if it showed the latter, it would then be rebutting testimony, and might be produced by either party, accordingly as he thought it would answer his purpose; for being a public registry, it is alike accessible to either party. I believe it has been customary at the land office, upon the payment of the purchase money for land warrants, or taking them out, to get receipts by the persons paying; and why not require this evidence, or the oath of the party that he never obtained such receipt, or if he did, that it was either lost or destroyed, instead of requiring a certificate from the officer having in charge the books of the land office, as a receipt would not only show the name of the person by whom the money was paid, which is the most that a certified copy from the books would do in any case, but the production of such receipt by the party would be, in addition, evidence of his identity?

[Campbell v. Galbreath.]

The second error is an exception to the opinion of the court below, in permitting the plaintiff there to prove by *Andrew Christy*, that he heard *Benjamin Lodge*, who was claimed to have been a part owner of the warrant say, that "whatever *John Walker* (who was also claimed to be a part owner of the warrant) did or would do, he (*Lodge*) would be bound by; and that *Walker*, was a partner with himself and *Probst* in the land ; that he (witness) heard *Lodge* say this in 1797 and frequently since, as late as 1800, both before and after the article with *William Fell*."

As evidence had been given that the deputy surveyor was employed by *Lodge* to make the survey, and it had been made upon his credit, and that he had actually paid sixty dollars towards the surveying fees of this and other lands, it seems to me that these declarations of *Lodge* were admissible and properly received, at least for the purpose of proving the authority under which *Walker* acted in making the agreement with *William Fell* to settle on and improve the land in dispute. In this point of view it cannot be said to have been admitted in contravention of the statute against frauds and perjuries, as has been contended by the counsel for the plaintiff in error ; because it is not to be considered as evidence of a transfer of any right or interest in the land, but of an authority to settle and improve, as required by the act of 1792, and to make those acts, when done, the acts of *Benjamin Lodge* himself, according to the maxim of law, *qui facit per alium facit per se.* There is certainly nothing in this statute which forbade *Lodge* from hiring a man by parol for a certain sum of money, or from employing another by parol to have it done by any one for him, that is, to go on and build a dwelling house upon the land, take possession of it with a family, make it the place of their abode, clearing and fencing the requisite quantity of land, and residing thereon for the space of five years ; in short, to do every thing required by the act of assembly of the 3d of April 1792. It can not be doubted, I apprehend, but that a settlement, improvement and residence obtained upon the land in this way would be a compliance with the terms of the act, and would entitle the warrantee to hold the land absolutely in fee simple. The contract would be executory and binding ; for our statute against frauds does not annul or make void any contract that is otherwise lawful ; and a personal action may be maintained for the breach of it. *Bell* v. *Anderson*, 4 *Dall.* 152; *Ewing* v. *Tees*, 1 *Binn.* 450.

The third error, which is an exception to the opinion of the court below, under which the agreement made with *William Fell*, by *Walker*, was admitted to be given in evidence, has been already answered ; and that the opinion of the court below, in this behalf, was right, has been shown in the answer just given to the second error.

The fourth error, which is an exception to the opinion of the court in admitting the declarations or admissions of *William Fell* in evidence, to show that it was for his son *George W. Fell* that he con-

tracted with *Walker;* or to show, in other words, that he, *William Fell*, under the contract which he had made with *Walker*, had employed his son *George* to make the settlement and improvement upon the land.   It appears to me, that it was competent for *William Fell* to do this, without having any writing with *George* on the subject; and that parol evidence of his admissions of the fact of his having made the contract for the benefit of his son *George*, or of his having given the benefit of it to him, so as to connect the acts of *George* upon the land with the right of *Lodge* and others, under the warrant, was properly admitted in evidence, upon the same principle that the evidence noticed in the second bill of exception was received.

The fifth error is, in principle, the same with the second and fourth, and cannot be supported.   The court below was right in admitting the testimony.

The sixth error is an exception to the opinion of the court below, in overruling the offer of the counsel for the plaintiff in error, who proposed " to examine *Samuel B. Foster*, Esq., one of the counsel for the defendant in error, for the purpose of showing that they had not been employed by *Josiah Galbreath* to bring this suit ; that they never had any communication with him, and never knew any such person."   It is difficult to conceive what occasion there was for giving such testimony ; or how, if given, it could have availed the plaintiff in error.   It was not pretended by the counsel for the plaintiff below that *Josiah Galbreath* was the real plaintiff in the cause ; that he had any interest in the land ; that they or any of them were employed by him, or knew any such person.   Such evidence, had it been given, would not have proved that there was no such person, or that *Josiah Galbreath* was a fictitious name.   Beside, it may be doubtful whether evidence to prove that there was no such person in being as *Josiah Galbreath*—the only name as plaintiff below on record, would have been admissible under the general issue, which was the one joined in this case ; such evidence would only have tended to abate the suit, and *perhaps* ought, therefore, to have been pleaded, or, at least, a previous notice to have been given of it, in order to prevent surprise.   Our action of ejectment is in no respect a fiction now, as it is in England.   And although our act of assembly on the subject directs that the plea shall be " not guilty," yet, it may be, that the legislature only intended to direct as to the plea in bar that should be put in to this action, and to leave pleas in abatement as at common law ; and the clause of the act which directs that the plea shall be " not guilty," when taken in connexion with the first section of the act, would seem to indicate something of this kind ; but as it is unnecessary to decide this question here, I do not wish to be understood as giving a decided opinion upon it.   See 1 *Comyn's Dig. tit. Abatement*, E. 16 ; *Wils.* 302 ; 19 *Johns.* 308 ; 1 *Chitty's Pl.* 435, 436.

But if there were such a person in being as *Josiah Galbreath*, I do not see that the defendant below could have derived any advantage

[Campbell v. Galbreath.]

from proving that *Josiah Galbreath* had never employed the counsel, or any of them, to bring this suit ; or, in short, that he had never authorized the suit to be brought, and knew nothing about it. If such testimony could have had any bearing upon the cause at all, it would have been rather to support the action ; as it would have tended to show that *Josiah Galbreath* was a mere trustee, and that his name, according to an ancient practice at the land office in taking out. warrants, had been used by *Lodge*, or whoever took out the warrant in this case. It would, at least, have been perfectly consistent with the claim set up by *Lodge's* heirs to the land ; that is, that *Lodge* was owner or part owner of the warrant, and caused the settlement to be commenced upon the land. But if the defendant. below had shown that there was such a person as *Josiah Galbreath ;* that he was the real owner of the warrant, and no transfer of it appearing to have been made by him to *Lodge*, *Walker* and *Probst*, or any of them : it is manifest, that, for want of even an effort upon the part of *Galbreath* to make a settlement at any time whatever, it would have been difficult to have sustained this action. I, therefore, cannot perceive any good reason why this evidence should have been received, and think the court below was right in rejecting it.

There were four points submitted by the counsel of the plaintiffs below, and seven by the counsel of the defendants, to the court, to be answered. The answers of the court upon these points, together with some things contained in the charge of the court to the jury, have been further assigned for error ; but, many of them involve the same question ; and all that have any relation to this case may be considered by way of answers to the following questions :

First ; Could the jury reasonably infer from the testimony, that *Benjamin Lodge* was owner, or part owner with *Walker* and *Probst*, of the warrant in the name of *Josiah Galbreath ?*

Second ; If *Josiah Galbreath* never had any interest in, or concern with the warrant, can this action be supported in his name ?

Third ; If *Josiah Galbreath* be a mere fictitious person, can this ejectment be supported in his name ?

Fourth ; Could the state have granted a vacating warrant for the land in dispute, after *George W. Fell* commenced his settlement and improvement, if he was the first settler on the land, as long as he continued, and persisted in completing the same, according to law ; although he did not commence them until more than two years after the 22d of December 1795, the time when all prevention to making settlement on account of the hostility of the Indians, ceased to exist ?

Fifth ; And if the state could not, could it grant one to *Thomas Campbell*, the assignee of *Alexander Hamilton*, after *Hamilton* had prevented *George W. Fell* from continuing his settlement and improvement on the land, by taking possession, and holding it, while *George W. Fell* was in possession of it, and after he had manifested his intention to settle and improve the land, under the warrant

[Campbell v. Galbreath.]

granted in the name of *Josiah Galbreath,* by building a cabin, and going into it with his bed and bedding, cooking utensils, and tools for working upon the land, &c. which appears, he being a young, single man, to have been all the property he had ?

In answer to the first question, I think, from the acts of *Benjamin Lodge,* in getting a survey made under the warrant, and paying for the same ; from his claiming the warrant as his property, in company with *Walker* and *Probst,* afterwards in 1797, before the time had expired within which a settlement was to be made on the land, according to the act of 1792, and the judicial construction put upon it, and causing a contract for the making of such settlement to be entered into with *William Fell,* of all which evidence was given to the jury, together with the lapse of twenty-six years, without any claim to the warrant, save that of *Lodge, Walker* and *Probst,* having ever been heard of—that the jury might well, and very rationally infer that they were the owners of it.

As to the second question, I consider that this action may be maintained in the name of *Josiah Galbreath* as a trustee, although he may have known nothing about it. I do not consider his assent to the trust necessary, in order to enable the *cestui que trust* to maintain the action in his name. To decide that it could not be supported without the consent of the trustee, in such a case, would be contrary, as I conceive, to what has been the universal usage and understanding throughout the state on this subject, since the practice first obtained in the land office, which is certainly of old standing, of taking out warrants and locations in the name of other persons, and using their names as trustees without consulting them, and without their consent at any time, either before or afterwards, being given. In England, and in those states where they have courts of equity, it is in the name of the trustee only that the action of ejectment can be maintained. But in this state, for want of a court of equity, it is different. *Ex necessitate rei,* the *cestui que trust* may maintain the action of ejectment in his own name ; otherwise he would be without a remedy, at least as against his trustee, where he is in possession of the land, and that possession is in no way necessary for the purpose of executing the trust. In Pennsylvania, the action of ejectment, where it is commenced against any other than the trustee, may be supported either in the name of the trustee; or the *cestui que trust.*

The proposition involved in the third question, does not arise in this case. There was no ground for the jury to presume, that *Josiah Galbreath* was a mere fictitious person. Every warrant granted for land by the commonwealth, is presumed to be granted to and for the use of the warrantee therein named (*Cluggage* v. *Duncan,* 1 *Serg. & Rawle* 117) ; and of course he must be presumed to be in existence, until the contrary be proved. But proof, that the warrant was granted for the use of one or more, not named in it, does not rebut the presumption, that the warrantee is a real person, and still

[Campbell v. Galbreath.]

in full life; and it does not appear that any other testimony was offered or given, from which the non-existence of *Josiah Galbreath* could reasonably be inferred.

In regard to the fourth question, it may conduce something to a correct solution of it, to examine, first, into the nature of the estate granted by a warrant issued, according to the provisions of the act of the 3d of April 1792, and then refer to the decisions of our courts, which have been heretofore made, together with some acts of the legislature passed subsequently to the act of 1792, on the subject.

The ninth section of the act of the 3d of April 1792, is in the following words: " no warrant or survey to be issued or made in pursuance of this act, for lands lying north and west of the rivers Ohio and Alleghany and Conewango creek, shall vest any title in or to the lands therein mentioned, unless the grantee has, prior to the date of such warrant, made or caused to be made, or shall, within the space of two years next after the date of the same, make or cause to be made, an actual settlement thereon, by clearing, fencing and cultivating at least two acres for every hundred acres contained in one survey, erecting thereon a messuage for the habitation of man, and residing or causing a family to reside thereon for the space of five years next following his first settling of the same, *if he or she shall so long live;* and in default of such actual settlement and residence, it shall and may be lawful to and for this commonwealth to issue *new* warrants to other *actual settlers* for the *said lands,* or any part thereof, *reciting the original warrants,* and that *actual settlements and residence have not been made in pursuance thereof;* and so often as defaults shall be made for the time, and in the manner aforesaid; which new grant shall be under, and subject to all and every the regulations contained in this act: provided always, that if any *such actual settler* or *grantee,* in any such original or succeeding warrant, shall, by force of arms of the enemies of the United States, be prevented from making such actual settlement, or be driven therefrom, and shall persist in his endeavours to make such actual settlement as aforesaid, then, in either case, he and his heirs shall be entitled to have and to hold the said lands in the same manner as if the actual settlement had been made and continued."

Now, although the language here employed by the legislature, would seem to make the settlement and residence required to be made upon the land, a condition precedent, by declaring no warrant shall vest *any title* unless the condition shall have been performed, if the party should so long live, as the term allowed by the act for the performance of it, and not be prevented from doing so, by force of arms of the enemies of the United States, yet it appears to me that it cannot be considered altogether strictly such. There are no technical words necessary to distinguish conditions precedent from conditions subsequent in their creation: the same expression may indifferently make either, being governable by the intention of the party who frames and effectuates the instrument. 2 *Woodeson* 140;

[Campbell v. Galbreath.]

*Ca. temp. Talb.* 166.    And wherever it appears to be the intent, that the estate shall vest previous to, and until the event which is to defeat it, this is construed to be a condition subsequent.    *Ibid.*    See also, *Spring* v. *Cæsar*, 1 *Roll. Abr.* 415 ; *W. Jones* 389.  The nature also of the condition which is to be performed may in some degree determine the character of it : as if an estate be granted to a man, *si ipse velit inhabitare*, &c. ; it is said that these words are a subsequent condition, because it is a thing of continuance, which may be infringed and broken every year.    See *Plowden* 32, note ; *Winch* 116 ; *Vin. Abr. tit. Cond. T. pl.* 33 ; *Lit. Rep.* 258 ; *Cro. Eliz.* 360.

Now, the nature of the condition which is to be performed under the act of 1792, makes it indispensably necessary, that the party should have a right to enter upon and possess the land ; and this right must be considered as granted to him by the warrant at least.    If it be not title, it is a considerable advancement towards what *Sir William Blackstone* defines to be a perfect one (2 *Bl. Com.* 195, 6), and must be considered more than a bare right to the possession of the land ; it is nothing short of an incipient and qualified right to it in fee, which is to become absolute and perfect upon the fulfilment of the condition, or happening of those events which dispensed with the performance of it.    I think, then, it must be admitted, that, under the warrant, the party has not only a right to enter upon the land for the purpose of performing the condition, but for doing and performing any act of ownership whatever, without being responsible for waste, or liable to be controlled by the state in any thing that he may think proper to do upon it, until after a failure upon his part to perform the condition within the time allowed by the act.    So if he be expelled forcibly from his possession, or invaded in it by another person, he has a right to maintain his action of ejectment or trespass against the intruder.    Beside, if the warrantee die within the time that is allowed by the act for making the settlement, without having made it, it is clear to me, that, by the terms of the act of 1792, an absolute estate in fee, is thereupon transmitted to his heirs by descent, which could not well be unless he died seised of such.

From these considerations, I am inclined to think that the condition of settlement and residence cannot be considered purely of a precedent character, but that an incipient and qualified right in fee to the land vests immediately in the grantee, upon his obtaining the warrant, liable to be defeated by a non performance of the condition, or to become absolute and unconditional upon the fulfilment of it, or upon the happening of those events which, by the provisions of the act, dispense with the performance of it altogether ; and that such an interest being vested in the grantee, he cannot be divested of it, even if he fail to perform the condition, but in the manner prescribed by the act of the 3d of April 1792, or some of the other acts passed in relation to the granting of lands north and west of the rivers Ohio and Alleghany and Conewango creek ; and that none other than

[Campbell v. Galbreath.]

the commonwealth can take advantage of the condition broken, un-
less authorised by some one or more of the acts last alluded to.

It may be proper also to observe and bear in mind, that although
the condition of settlement may be considered as forming a part of
the consideration for which the land is to be granted, yet the pay-
ment of the purchase money would seem to have been the primary
and great consideration with the legislature at the time of passing
the act of 1792 ; for in no case is the payment of it to be dispensed
with, nor a warrant to be granted until it has been paid.    See the
last clause of the tenth section.    But the death of the warrantee is,
by the express provision of the ninth section, sufficient under certain
circumstances to dispense with the settlement and residence upon
the land.    I am aware that a different sentiment was entertained by
the late Mr Justice *Yeates*, 4 *Dall.* 204, and therefore have expressed
mine with the highest degree of diffidence.

With respect to these lands lying north and west of the rivers
Ohio and Alleghany and Conewango creek, it was said, and decided
by our courts in *Morris* v. *Neighman*, 2 *Yeates* 450;  *Commonwealth*
v. *Cox*, 4 *Dall.* 204, 205 ;  *Wilkins* v. *Allenton*, 3 *Yeates* 278 ;  *Jones* v.
*Anderson*, 4 *Yeates* 576, and  *Skeen* v. *Pearce*, 7 *Serg. & Rawle* 304,
that the commonwealth alone could take advantage of the condition
broken by the warrantee; and that this was to be done by granting
a new warrant, or what has been very commonly called a *vacating*
warrant.    But the question did not fairly arise in any of these cases,
excepting the last ;  for the settler had entered upon the land within
the two years allowed by the act to the warrantee to commence his
settlement; and in *Skeen* v. *Pearce* it does not appear whether he
took possession of the land within that time or not.    It however has
been said, and most likely it was so, that it was after the two years
had fully expired, and the warrantee had neglected to commence or
make a settlement ;  for the court seems to have decided the abstract
question, without regard to the time when the settler obtained pos-
session and commenced his settlement.    So far as it has been decid-
ed or said by our courts and judges, that no one who enters upon
warranted land before the expiration of the time allowed for making
the settlement shall acquire any right thereby, or gain any advan-
tage over the warrantee, is no doubt correct: or if the warrantee be
the first to enter upon the land, and to make or cause to be made a
settlement after the two years or more that have expired, I think
that he must be preferred; and that neither the commonwealth nor
any individual can take advantage afterwards of the condition
broken, as long as he continues and keeps up the settlement and
residence in the manner required by the act.

The courts of this state seem hitherto to have entertained the
opinion, and to have laid it down as the law, that the land lying
north and west of the Ohio and Alleghany, and Conewango creek,
after being surveyed under warrants granted by the commonwealth,
could not, where the warrantees had failed to commence settlements

L

[Campbell v. Galbreath.]

within the term prescribed by the act of the 3d of April 1792, be entered upon by any other persons, nor be settled and improved by them, without their becoming trespassers, unless they had first obtained from the commonwealth " new warrants, reciting the original warrants, and that actual settlement and residence had not been made in pusuance thereof." In this construction of the act of 1792, I would have entirely concurred; indeed, I would have felt myself bound to have done so, from the decisions of the circuit and supreme courts in the cases already cited, if no other act had been passed by the legislature on the subject; although I am inclined to think, that it would very fairly have borne a directly opposite construction. For the ninth section directs, that in default of the original warrantees to make settlements and residence upon the land, that it shall be lawful for the commonwealth to issue *new warrants*, that is, what have been since called vacating warrants, to other *actual settlers*. These terms presented a difficulty in giving to the act the exposition which it received, and were held to mean other persons, *who were desirous to settle and improve*. 3 *Yeates* 277; 7 *Serg. & Rawle* 304. To justify this change and substitution of terms, it has been said, that the intention of the legislature would be better fulfilled, and all the words of the clause receive their full operation. And again, that the term *actual settlers*, employed frequently throughout the act, is not applied exclusively to him who has made and continued his settlement, but is used to denote one *who is desirous to settle*. If this latter be so, I have not been able to discover it; neither am I satisfied that the meaning of the legislature will be better promoted by changing the phraseology. In the third section, those who *have* settled, and those who are *desirous* to settle, are terms that cannot be mistaken. In the fifth section, the term " actually settled," is used to designate land that *has* been settled, and not land *to be* settled. In the eighth section, the deputy surveyor is directed to make a survey for any person, on his application, who *has* made an *actual* settlement, which, without a clear perversion of both the words and meaning of the legislature, cannot be made to mean a person who is *desirous* to settle. In the ninth section, the term " actual settlement" must be understood to mean a settlement *already* made, and not one *intended* to be made : and again, the term " actual settler," used in the proviso of this section, refers to, and was intended to designate a person who *had commenced* a settlement and was driven from it. So in the tenth section, the same distinction and meaning are manifest. In short, it appears to me, that throughout the whole of the act, that as often as the term " actual" is applied to, and used in connection with the term " settlement," or " settler," it was intended to convey the idea of a settlement which had been made, or at least commenced; or a settler who either *had been*, or was at the time residing on, and in the *actual* possession of the land. And I am likewise inclined to believe that this understanding of these terms throughout the act is necessary, in order to carry into effect the intention of the legislature; be-

[Campbell v. Galbreath.]

cause it will be admitted by all, that from the act it is manifest, that it was not the design, or at least not directly intended, that the commonwealth should be paid for the land, at the rate of more than twenty dollars per hundred acres, besides making a settlement and residence, such as is mentioned in the act. As no warrant could be obtained without the purchase money being first paid, the only thing that remained after that to be done, to satisfy the utmost wishes of the commonwealth, was to make the settlement and residence as specified in the act. If, however, the warrantee neglected to do this within the time prescribed, is it not most reasonable to suppose, that the legislature intended that no other than an *actual* settler, or one who had previously commenced his settlement and residence upon the land, should have a new or vacating warrant for it? The commonwealth having received the purchase money for it from the original warrantee, the next great object was to have the land settled and improved; and by whom was this so likely to be done, as the man who had already given *earnest* of what he would do in this respect, by his having entered upon the land with his family, manifesting by his acts, to the world, his intention and determination to complete the settlement and residence required? But, according to the construction which has heretofore been put upon this act by the judiciary of this state, all that class of citizens who are without much money, but far the most likely to be willing to undertake and to perform this latter condition of settlement and residence, are entirely excluded; and hence the settlement and improvement of the land are necessarily postponed, until the moneyed class shall find it convenient, and their interest to do it. It cannot be denied, that it was the intention of the legislature in passing this act, to accommodate both these classes of citizens; and as my construction does not necessarily exclude either, it must therefore be more in accordance with their design and intention, and ought also for that reason to have been preferred. The construction as it appears to me, is fortified and strengthened by a provision contained in the tenth section; which directs, that in case of *actual settlers*, unless hindered by death, or the enemies of the United States, neglecting to apply for warrants for the space of ten years after the passing of the act, that the land shall be granted to "*others*," without the addition of "settlers:" showing pretty clearly, that where the settlements and residence required by the act had been made, but the purchase money not paid, that the lands might be granted to any other persons who would pay the purchase money to the commonwealth, without their being actual settlers. Indeed, that could not be, as long as the original settlers or those claiming under them, continued in the actual possession. It is clear, that this provision was introduced into this latter section, and the phraseology changed, with a view to have the purchase money, where none had ever been paid for the land, paid as early as it was thought would comport with the ability of actual settlers; and if they should neglect to pay after that period,

[Campbell v. Galbreath.]

then to obtain it, and grant the land to the first settler or no settler, that should offer it.

Were it not however for other acts of the legislature, which have been since passed, on the subject of granting these lands, lying north and west of the rivers Ohio and Alleghany and Conewango creek, I should feel myself bound, as I have said, to adhere to what seems to have been the judicial construction of this act of 1792. But when I come to look at the acts of the 22d of April 1794, of the 22d of September 1794, of the 2d of April 1802, and of the 3d of April 1804, it is impossible for me to doubt for a single moment of the intention of the legislature to give the authority and the right to persons who were desirous of securing lands first by a settlement, to enter without a new or vacating warrant or filing an application for the same, upon lands which had been surveyed under original warrants, but not settled by the warrantees within the two years or any subsequent period.

The act of the 22d of April 1794, *Purdon's Dig.* 532, *sec.* 1, declares that "from and after the passing of this act, no application shall be received in the land office for any *unimproved* land within that part of this commonwealth, commonly called the *New Purchase,* and the triangular tract upon Lake Erie." The second section further declares that "*no warrant shall issue* after the 15th day of June next, for any land within that part of the commonwealth, commonly called the New Purchase, and the triangular tract, upon Lake Erie, except *in favour of persons* claiming the same by virtue of some *settlement and improvement being made thereon.*"

The tract of land commonly called the New Purchase, and the triangular tract upon lake Erie, are the same which were purchased of the Indians, at fort M'Intosh, in 1784, and of the United States: the first, of the Indians, and the second, of the United States; and every one knows, that these two tracts of land embrace all the land lying north and west of the rivers Ohio and Alleghany, and Conewango creek. This act, then, prohibits, in express terms, the receiving at the land office any application for unimproved land, or the issuing of any *warrant,* except in favour of persons for lands which they claim by virtue of some settlement and improvement made thereon, which lie within these two tracts. The direction and command are, that "*no* warrant shall issue," which is positive and peremptory. It will not satisfy the terms of this act to say, that *new,* or *vacating warrants* are not intended to be embraced, because the term "warrant," is general, and includes both *original,* and *new* or *vacating* warrants; and every land warrant that can be issued, must fall within one or other of these two classes; unless a warrant of acceptance, which is not applicable to the present case. Beside, I can perceive no clause or expression in this act, showing that any such distinction was designed. The next act, in order of time, was passed the 22d of September of the same year; by the first section of which it is enacted, that "from and after the passing of this act,

[Campbell v. Galbreath.]

*no application* shall be received at the land office, *for any lands within this commonwealth,* except for such lands *whereon a settlement has been,* or *hereafter shall be made, grain raised,* and *a person or persons residing thereon.* The restriction contained in this act is equally positive and mandatory with the last. It extends to *all* the lands within the commonwealth, without exception ; and it is difficult to conceive how any exception, in this respect, could be raised by construction. The terms of the act are express and unqualified. There is not even any thing contained in the title of this act, that would seem to indicate that the legislature intended to provide for the disposition of lands in one district or section of the state more than another. If so, it is clear, that after the passing of this act, no original, or vacating warrant could be issued ; for no application could even be received for that purpose, unless the lands were previously or thereafter settled, grain raised, and a person or persons residing thereon. This act has not only prohibited the issuing of warrants for lands unsettled and unimproved, but has defined and set forth the nature and extent of the settlement and improvement that must be made upon the land, before a warrant of *any kind* shall be issued for it ; so that, if the land forfeited by a warrantee, for not having made the settlement and improvement within the time prescribed by law, be not open to appropriation by settlement for any person who may please to enter upon it, after the forfeiture, without first having obtained a vacating warrant, it would appear, then, that after the passage of this act, these lands could not be disposed of in any manner or form known to the law, and that the warrantees might continue still to be the owners and holders of them, without ever making a settlement. Now, surely, such a thing has never even been dreamed of. Nobody ever supposed that the warrantees were discharged from the condition of settlement and residence ; nor that the legislature had deprived the commonwealth of all remedy to take advantage of the forfeitures in such cases.

The next act was passed on the 2d of April 1802, and has a *specific* reference to the lands lying north and west of the rivers Ohio and Alleghany and Conewango creek ; for it declares in the following words : " in order to prevent the confusion that would arise from issuing different warrants for the same land ; and to prevent lawsuits, in future, respecting grants from the land office ; under the act of April 3d, 1792," it is enacted, " that from and after the passing of this act, the secretary of the land office shall not grant *any new warrant, for land which* he has reason to believe *hath been already taken up under a former warrant;* but in all such cases, he shall cause a duplicate copy of the application to be made, on which duplicate copy he shall write his name, with the day and year in which it was presented, and he shall file the original in his office, and deliver the copy to the party applying : provided always, that on *every application* so to be made and filed, shall be certified on the oath or affirmation of one disinterested witness, that the *person making such application,*

[Campbell v. Galbreath.]

or in *whose behalf* such application is made, *is in actual possession of the land applied for ;* and such certificate shall mention also the *time when such possession was taken :* and the application so filed in the secretary's office shall be entitled to the same force and effect, and the same priority in granting warrants to actual settlers, as though the warrants had been ·granted at the time when applications were filed." This act is confirmatory of the construction and application which I have put on and made of the other acts ; for it is predicated upon the principle of law, that no other than an *actual settler,* or some one on his behalf, was entitled to apply for a *new,* or *vacating warrant ;* and directs what proof shall be adduced, not only of being in the *actual possession* of the land applied for, but of the time when he took that possession. From the express provision of this act, no application for a *new warrant* can be received, unless proof be made that the applicant is *in the actual possession* of the land. The warrant spoken of in this act, is described in the same terms of the vacating warrant, which is directed to be issued by the act of the 3d of April 1792, and substitutes the filing of the application and giving a duplicate of it to the applicant, for a *new,* or *vacating warrant.* This act appears to me to be so plain and positive *in its* terms, that it is susceptible of but one construction, which is, that an application is substituted by it, in place of a *vacating warrant ;* and that no application can be received, except in favour of the man who has previously become an *actual settler, in the possession of the land,* and *still continuing in the possession of it.*

The act of the 3d of April 1804, followed the one which I have last noticed, and shows in the first place, that the legislature con- ·sidered the act of the 22d of September 1794, as applying to and ·embracing the lands lying north and west of the rivers Ohio and Alleghany and Conewango creek, and that applications for these lands, more than other lands within the state, could not be received at the land office, unless a settlement had been or thereafter should ·be made upon them, as also grain raised and a person or persons ·residing thereon. It in the next place demonstrates that *applications* filed in the land office, by *actual settlers,* where the party was entitled, under the act of 1792, to a vacating warrant, are to be considered as substituted for *vacating warrants,* and to have the same force and ·effect, and that the party shall be permitted to make proof of his improvement and residence, as fully, and *with equal force and effect, as if he had obtained a vacating warrant.*

It has been said that this act furnishes evidence of the legislature having approved and acted upon the judicial construction of the act of the 3d of ·April 1792. · 7 *Serg. & Rawle* 305, 306. It however does not present itself to my mind in this point of view ; but rather evidences the contrary. It must be observed, that the terms of this act are such, as to embrace applications then filed, or those which might be thereafter filed with the secretary of the land office ; and as it is only such applications as were made out in conformity to the

[Campbell v. Galbreath.]

requisites of the act of the 22d of September 1794, showing that a settlement had been made, and grain raised on the land, and that a person was residing thereon, that are provided for by this act of 1804, it proves, that the legislature considered the act of the 22d of September 1794, as directly applicable to the lands lying north and west of the rivers Ohio and Alleghany and Conewango creek ; and that any person was thereby authorised to enter upon them, for the condition broken, and to settle and improve them, that he might entitle himself to a warrant for them. Beside, I have already shown, that by the express terms of the act of the 22d of September 1794, no application for a warrant for land could be received at the land office for unsettled, unimproved and uncultivated land. Yet from the act of the 3d of April 1804, applications for lands, for which vacating warrants might have been issued under the act of the 3d of April 1792, might have been received and filed in the land office; but not without having been previously settled, improved and cultivated as directed and required by the act of the 22d of September 1794. In addition to this, it must also be recollected here, that the act of the 2d of April 1802, which has been recited and explained, prohibited the issuing of vacating warrants, and substituted the filing of applications in the land office, and the giving of copies of the applications instead of the warrants, and that in doing so, no applications were to be received for unsettled lands, but for such only as were settled and improved, and from those only, by or on behalf of whom, they had been settled. All which, as it appears to me, tends to repel the idea of the legislature having ever recognized or sanctioned the judicial construction of the act of the 3d of April 1792. These acts being all enacted *in pari materia,* must be construed as parts of the same act, and so as to give consistency to the whole if practicable. Now, by observing this rule, I cannot entertain a moment's doubt, but that the legislature have thereby authorised any person who may have thought proper to do so, to enter upon and settle lands lying north and west of the rivers Ohio and Alleghany and Conewango creek, which had been granted by original warrants to persons who had failed to perform the condition of settlement and residence ; and thus to take advantage of the condition broken, without either obtaining a vacating warrant or filing an application therefor. Otherwise, the absurdity as well as contradiction will be imputed to the legislature, of having declared, that in no case shall an application for a vacating warrant be received at the land office, unless the land has been previously settled and improved by the applicant, or one from whom he derives his claim, and the applicant be in possession thereof; and that notwithstanding this, they have denounced such applicant a trespasser and intruder. If the legislature had even said, that applications for vacating warrants might be received from such persons as had settled upon these lands previously granted by original warrants, where the warrantees had failed to make settlements within the time prescribed, it would have

been sufficient to have authorised an entry upon the lands by such settlers for the condition broken, and to have taken advantage of it; but they have gone further, as I conceive, and have declared expressly, that applications for vacating warrants shall be received from no others than those who shall have settled, cultivated and improved the lands.

In the case of an estate held upon condition, I agree that according to the principles of the common law, its determination is not effected before entry of the grantor or those claiming under him. *Noy's Maxims* 81; *Co. Litt.* 202 *a*, 240 *b*; 1 *Shep. Touch.* 153. Hence a grant by the crown, of an estate forfeited before an injunction finding the forfeiture, is illegal and void. *Leighton's Case*, 2 *Vern.* 173; 7 *Co.* 36. But as the late Mr Justice *Duncan* observed in *Skeen* v. *Pearce*, 7 *Serg. & Rawle* 304, " where the law prescribes the mode and manner in which rights to lands, accruing to the state, by reason of any default in the grantee, shall issue (or be acquired), that mode, and no other, must be pursued." Here it is, as I think I have already shown, that any one who pleases may take advantage of it by entering upon the land, and making and continuing a settlement and residence, after. the forfeiture by the original warrantee.

Time is said to be of the essence of the condition; which if not performed by the warrantee within the *time prescribed*, he shall claim no benefit under his warrant, from his subsequent performing or attempting to perform it. No doubt time is of the essence of the condition, so far as to determine when the land may be entered on for the condition broken; but where the warrantee, who has already paid the purchase money for the land to the state, and has been the first to make the settlement, improvement and residence upon it, in fulfilment of the terms and condition, and in discharge of the whole consideration upon which it was granted, is it not perfectly reasonable and equitable that his subsequent settlement, improvement and residence, should be accepted and taken by the state in satisfaction of all that was required of him at first to vest in him an absolute estate in fee-simple in the land? Seeing the state has his money, and he has been the first to make the settlement upon the land, it seems to me that he ought in equity and fairness to be allowed the full benefit of holding it under the original warrant, in the same manner as if he had complied with the condition of settlement, improvement and residence, within the time prescribed by law. It was uncertain how long it might have been before that the land would have been taken by any other; and therefore the state has been the gainer in thus obtaining all that was originally required for it, more early than it possibly could have been had from any other, the great object of the legislature, as set forth in the act of the 3d of April 1792, being substantially answered and satisfied. I am of opinion that the warrantee can not be required by the state to pay the purchase money a second time, and to take out a new or vacating warrant for the land.

[Campbell v. Galbreath.]

I also consider this to be in accordance with the spirit and design of the legislature, as manifested in the sixth section of the act of the 20th of March 1811. *Purdon's Dig.* 543. The interest, as well as the desire of the state, was to have the terms and conditions upon which the land was granted performed as early as possible; and justice would seem to require that the land should be given to the first who should comply with them.

If the view which I have taken of this subject be correct, it follows, that where the original warrantee has been the first to commence a settlement upon the land, although not within the time allowed by law for that purpose, and is following it up, but the land is entered upon and his possession of it invaded by another, who builds a house upon the land and takes up his residence there, this other person must be considered a trespasser and intruder, and ought not therefore to gain any advantage from his unlawful intrusion; nor ought his violent and illegal conduct be suffered to prejudice the warrantee under such circumstances.

If *George W. Fell* entered first upon the land, under the owners of the warrant in this case, and commenced a settlement, improvement and residence, such as are required by the terms of the act of the 3d of April 1792, with an honest intention of completing the whole, and was engaged in so doing when *James Hamilton* came first on the land and commenced his settlement, and afterwards when *Alexander Hamilton* succeeded *James Hamilton* in this possession of *his* settlement and improvement, without the consent of *Fell* and the owners of the warrant, the plaintiffs below ought to recover the land. I do not think that the subsequent sale of the land by *Alexander Hamilton*, who was a mere trespasser, to *Thomas Campbell*, ought to place *Campbell* in a different situation from that in which *Hamilton* stood; for it appears that *Campbell* had full notice of *Fell's* improvement made upon the land before he bought, which was sufficient to have put him upon his inquiry, and to have ascertained from *Fell* whether he had any claim to the land, and under what right; and if he had then left the possession, why he had done so. When *Fell* commenced his settlement, whether before or after *Hamilton* commenced his, whether under the owners of the *Galbreath* warrant or not, and if under this warrant, and before *Hamilton*, whether he commenced it with a *bona fide* intention of working, such as the act of the 3d of April 1792 requires, were questions to be left to the decision of the jury as matters of fact; and if found in favour of the owners of the warrant, their case ought to be considered as falling within the principle established by this court in *Jones* v. *Anderson*, 4 *Yeates* 569, that the adverse possession of an actual settler, within the time allowed to the warrantee to make his settlement, was *ipso facto* a prevention. By the application of this principle, the *Hamiltons* and *Campbells* would be considered trespassers, and as having taken possession, at least of a part of the land from *Fell*, when he was entitled to the whole of it; and as having thereby pre-

M

[Campbell v. Galbreath.]

vented him from improving the land in the manner he might wish, and certainly had a right to do. The wrong-doer has no good reason to complain of the application of this principle ; it is only a just punishment inflicted upon him for his demerits, and at the same time a retribution to the party injured, while the state sustains no loss by it; for whether the condition of settlement, improvement and residence, be completed by the one or the other, the loss or gain to her is the same. See *Litt.* 334. Besides, I think it right upon the score of sound policy, in order to remove all temptation to commit a wrong or trespass; as in the case of an estate granted upon a condition against law, the estate upon this principle will be held good and absolute, and the condition void. *Co. Litt.* 206. Nothing short of twenty-one years adverse possession on the part of the disseisor can give him a right to the land. It is not the case of two actual settlers, as in *Crosby* v. *Brown,* 2 *Binn.* 124, where the elder settler, after having made some improvements upon the land, was prevented from continuing them by the violence of a younger settler, and left the land for several years before he took any steps to recover the possession from the younger, who still continued to hold it and to improve the land : it was held by this court that the plaintiff's claim or title to the land was not such as would enable him to bring and maintain his action at any time within the twenty-one years; and that it ought to be left to the jury to decide whether he had not relinquished his settlement. It must be considered as the case of a warrant holder who had paid to the state the whole of the purchase money, and had seated himself upon the land, performing the last act necessary to invest him with an absolute legal title in fee to it. It is even a stronger case than that of *Jones* v. *Anderson,* where the warrant holder had never taken actual possession of the land, nor attempted to make, either by himself or any other, a settlement upon it; but had lain by more than two years after the date of his warrant, and about five months after the confirmation of *Wayne's* treaty with the Indians, when the settlement under which the defendant claimed was commenced adversely to him, and continued without any threats or force whatever being used at any time on the part of the settler to prevent or deter the warrant holder from making an actual settlement upon the land.

The necessary conclusion to be drawn from the train of reasoning here offered is, if *Lodge, Walker* and *Probst* were the owners of the warrant, issued in the name of *Josiah Galbreath;* and *George W. Fell* made under them the first actual settlement upon the land, with a *bona fide* intention of making it *exclusively* the place of his abode and residence, by building a house or messuage thereon, suitable for his habitation, clearing, fencing, and cultivating at least two acres of the same for every hundred acres contained in the survey under the warrant, and *residing* thereon with such family as he might have, for the space of five years then next following the first commencement of his settlement ; and again, if the work of such

[Campbell v. Galbreath.]

settlement, improvement and residence were pursued, kept up and persisted in by *Fell*, with reasonable diligence, until *Hamilton* entered upon and took possession of the land ; and these things are all matters of fact to be left to and decided by the jury, from the evidence that shall be given in relation to them ; the plaintiffs below ought to recover.    But if the jury should be of opinion, from the evidence, that *Lodge, Walker* and *Probst* were not the owners of the warrant, or that *Fell* did not settle the land first under them ; or that he did make the first settlement, but not for or under them ; or that it was not made with the intention above expressed and prosecuted, kept up and maintained with reasonable diligence, until the time that *Hamilton* took possession ; then the defendant below ought to hold the land.    But, inasmuch as these matters of fact were not submitted by the court below to the jury, under the view that has here been given of what the law is on this branch of the case, the judgment rendered there must be reversed, and a *venire facias de novo* awarded.

The fifth question has, in effect, been answered, by what I have said ; for if the facts of the case shall be found by the jury, from the evidence that shall be given upon another trial, to be as I have stated they must, in order to entitle the plaintiffs to recover, it follows, that the warrant and patent to *Campbell*, for the land in dispute, were improvidently granted, and, therefore, cannot avail him.

HUSTON, J.—The word *settlement*, as applied to that occupation of vacant land, that is, of land not owned by any person, under a right derived through the land office, from the late proprietors or from the state, is very old.    There are lands held by settlement, without other title, which commenced one hundred years ago. There are many hundreds of tracts which have passed from father to children, and from grantor to grantee, without office title, whose settlement commenced fifty, sixty, and seventy years ago.    At one period of our history, from 1784 till December 1786, our then supreme court made some decisions which alarmed every body ; and an act of assembly was passed, declaring all warrants which should issue for lands on which a settlement had been made, except to the settler, or his legal representative, should be null and void.    And, soon after, the courts decided, that all such warrants which *had* issued for land occupied by a settler were void.    The same thing had been decided, and was the settled law, before the revolution.    See *Bonne* v. *Devebaugh*, 3 *Binn.* 175.

The law of December 1786, however, defined a settlement to be, " an actual, personal, resident settlement, with a manifest intention of making it a place of abode, and the means of supporting a family, and continued from time to time, unless interrupted by the enemy, or going into the military service of his country."    The above law, and the uniform decisions of our courts, except the period above mentioned, threw out of protection a class of improvements made and intended to keep off other settlers and warrant-holders, until he

[Campbell v. Galbreath.]

who made some trifling improvement could sell it; and sanctioned and established the kind of settlement described in the act of 1786: and from the earliest times, no act of the legislature, and no decision of court, has permitted such settler to be evicted by any grant which could be acquired from the land office. (I except islands, and some tracts of country which, for a short period, &c. for good reasons, were not open to settlers.)

The act of the 3d of April 1792, was passed by men who knew the history of our titles and were not ignorant that settlements had been made, not for the purposes mentioned in the act of 1786, by men who never resided or intended to reside on the land improved, or to make it the means of supporting a family; and to guard against such abuse, used the term *actual*, connected with settler, and with settlement; and again defined, what, under that act, should constitute an actual settlement. After having provided that a survey should be made on every warrant, and for every actual settler without warrant, the ninth section says, "no such warrant or survey, to be issued or made in pursuance of this act, for lands lying, &c. shall *vest any title* in or to the lands therein mentioned, unless the grantee has, prior to the date of such warrant, made or caused to be made, or shall within the space of two years next after the date of the same make or cause to be made, *an actual settlement thereon, by clearing, fencing and cultivating at least two acres, for every hundred acres contained in one survey, erecting thereon a messuage for the habitation of man and residing or causing a family to reside thereon for the space of five years next following the first settling of the same, if he or she shall so long live.*" The supreme court of the United States have supposed two conditions were added to the grant: first, actual settlement within two years, and secondly, continuance of the settlement five years, and performing the acts prescribed. No such thing: by clearing, fencing, &c. to the end of the sentence, is a description of what kind of settlement would give title, and it was wisely provided. Young men, in the face of the law, have gone from home twenty or one hundred miles, commenced a dozen settlements in one month, and next year worked a week on each, and so on. This, and every thing like it, is not as directed by the law. And again, holders of great numbers of warrants have hired the same man to make, and, in their language, to keep up, twenty settlements or so many of the tracts for which they had warrants. The law of 1786 was, when enacted, supposed to be sufficiently particular—personal resident settlement, intention to make it the place of abode and means of supporting a family—continued from time to time; but all these might be simulated. This act prescribes when to commence, the quantity to be cleared and cultivated, the building a house, residence of a family therein and that for five years—these words "for five years," come instead of the words "from time to time," in the former law. This construction of the sentence, which from the first struck our own judges, cures all the bad grammar, and the supposed incon-

[Campbell v. Galbreath.]

sistency, which was found by judges not acquainted with the nature and history of title by actual settlement, and can deceive no one who was acquainted with the law on improvements. There is another part of this sentence, which one side in court uniformly read in an under tone, and never afterwards mentioned. No warrant or survey *shall vest any title* in or to the land described, unless, &c. ; sometimes when these words have pressed themselves on a court, the common law, as applied to contracts between man and man, and the learning on conditions precedent and subsequent, is brought in. The common law is declared to be in force, to a certain extent, by our constitution and several acts of assembly ; but it is only in force until our own legislature make provision on the subject, and instantly the common law so far ceases and is extinct, and the enactments of our own legislature on that subject become the law of the land ; and when our own statute, in terms which cannot be mistaken, says, no title to lands which it offers for sale shall vest, until a certain thing is done, in a certain way, there is and can be but one inquiry, viz., Had the legislature power to pass such an act? and to that question, in this case, there can be but one answer.

If the common law is at all to be resorted to on this subject, it will, as I believe, furnish a different rule as applicable to those who claim under a statute ; and that rule is, that when a right is given by statute, he who claims that right must bring his case within the terms of the statute. What is required by law to be done, must be done, or no right attaches. And this rule is admitted and supported to its full extent by the supreme court of the United States, in *Wilson* v. *Mason*, 1 *Cranch* 45, 97, 98, as applied to grants of land under the laws of Virginia ; and in that case a man who had paid his money, and got his survey returned before any adverse claim, but who, instead of performing what was required by the act, had substituted what he thought was equivalent, was declared to have no title in law or equity ; and the owner of a subsequent office title, and who had full notice of all that had been done by his opponent, held the land ; and in that case it was not imagined that any act of the state, claiming the forfeiture, was necessary. I proceed to quote the residue of section nine, observing that the whole section is comprised in one sentence : " and in default of such actual settlement and residence, it shall and may be lawful to and for this commonwealth to issue *new warrants to other actual settlers*, for the said lands, or any part thereof, reciting the original warrant, and that actual settlement and residence have not been made in pursuance thereof, and so often as defaults shall be made *for the time and in the manner aforesaid*, which new grants shall be under and subject to all and every the regulations contained in this act : provided always, that if any such actual settler, or any grantee in any such original or succeeding warrant, shall, by force of arms of the enemies of the United States, be prevented from making such actual settlement, or be driven therefrom, and shall persist in his endeavours to make

[Campbell v. Galbreath.]

such actual settlement as aforesaid, then, in either case, he and his heirs shall be entitled to hold the said lands in the same manner as if the actual settlement had been made and continued." If there could be any doubt on the construction of the first part of the sentence, this would remove it. Most clearly, by the first part, the claimant, whether he had a warrant or not, must make the actual settlement there described and then follow ; and in default of *such actual* settlement and residence, &c. the land is to be regranted and so on as often as default is made ; and in the proviso, again, we have the expression *such actual* settlement ; it is not in default of making *an* actual settlement, it is *such actual settlement*, and in one place, *the* actual settlement.

There is no colour for the supposition that such actual settlement as is there described, could be dispensed with in favour of a warrantee, more than a settler without warrant. In default of such actual settlement, *new warrants* are to issue. The phrase " new warrants" can only apply to cases where warrants had before issued ; and the provision, " that the lands shall be regranted so often as default of settlement occurs, and that every new grant shall be subject to *all* and *every* regulation contained in the act," ought to have put an end to all question as to whether the object of the legislature was to get the price of the land, or to increase its population and wealth and strength by securing an industrious and hardy population. It did not mean to give away its lands ; but that its determination was never to part with the title until each tract was a cultivated farm, supporting a family, is most clear.

The proviso does not dispense with the necessity of *such* actual settlement, it only suspends, in certain events, the time within which it is to be made. To raise a doubt on the subject, you must, in the face of every provision of the law, assume that the warrantee is not as much bound to make *the actual* settlement directed, as if he settled without a warrant ; and, in opposition to the universal usage of the English language, you must say, there is no difference between the meaning of the words " attempt," " endeavour" and " persist." Nay, more, that " persist in his endeavours" only means to make an actual settlement, by clearing, fencing, and cultivating, at least two acres for every hundred contained in one survey ; that " erecting a house, for the habitation of man, and residing five years thereon," means, he shall make an attempt to settle on the land. Nay, it is still worse ; you must say that, " if driven therefrom, he shall persist in his endeavours to make such actual settlement," means, that if he is driven therefrom, he need not return, and that, in such case, the expression " persist in his endeavours to make such settlement," has no meaning, and was not intended to have any meaning.

The owners of warrants, and those who settled without warrants, came early into collision, and on each side contended for a construction not warranted by the law. The grantees of warrants obtained patents, without even commencing a settlement, on certificates from

[Campbell v. Galbreath.]

two justices of the peace that they had been prevented by enemies; and the persons claiming by settlement, contended that warrants were void unless settlement commenced within two years from date of warrant.   The war raged during the whole of the two years, or during a great part of it.

This matter was brought before the supreme court of this state at March term 1800 (*The Commonwealth* v. *Cox*, 4 *Dall.* 170), and the decision was, " that in all events, except the death of the party, the settlement described in the act, continued for five years, must precede the vesting the estate ; and that though the prevention by enemies continued the whole of five years, and the grantee persisted in his endeavours during all that period, yet he must complete the settlement after prevention ceased, or no title vested; in other words, the war excused during its continuance, but settlement must be commenced within two years after the peace, and be continued according to the act, or no title vested.

In 1802, the contest still raging, even to riots and bloodshed, an act of assembly to continue in force two years was passed, prescribing a mode intended to terminate the dispute.   4 *Dall.* 237.   This proposed two questions.   The answer to the first is as before, that the terms required by the act must be complied with ; " for the legislature regarded a full compliance with the condition of settlement and residence as an indisputable part of the purchase, or consideration of the lands so granted."   But the court gave full scope to the proviso, and decided that the time did not begin to run during the war, or was suspended during its continuance ; and that where a person, within two years of the date of the warrant, or as the case stood, within two years of the 23d December 1795, the date of ratification of *Wayne's* treaty, sat down on land granted by warrant, and kept the warrantee from making a settlement, such person should not object that a settlement was not made, when he himself prevented the warrantee from making it.

On this subject there was no diversity of decision in the courts of this state.   See cases hereafter cited.

But I cannot say as much of the construction of another clause of this section, viz. " in default of such settlement and residence, it shall and may be lawful for the commonwealth to issue *new warrants* to *other actual settlers,* for the said land, or any part thereof, reciting the original warrants, and that actual settlement and residence have not been made in pursuance thereof, and so often as default shall be made for the time, and in the manner aforesaid ; which *new grants* shall be under, and subject to all and every the regulations contained in this act."   This clause has given rise to a contest not yet settled, as to the nature and necessity of these warrants re-granting the land, and to whom they could be issued.   The term *vacating warrant* is not in this act, or any other act on the subject, until 1804 ; it was not used in court for several years.   It is now used, and used very improperly.   Under the proprietary government, the legislature

[Campbell v. Galbreath.]

never passed any law as to the mode of selling the lands ; or if they did, the king never confirmed such act. The proprietor was sole owner of the soil, and disposed of it on his own terms. The officers of the land office were his attorneys, in fact, and they, together with the commissioners of property, and the governor, for the time, changed these regulations at their pleasure. There was a time when these officers issued vacating warrants, and as the records of the land office are very defective, we know little of them : from my researches I would say, they generally issued at the instance of the warrantee ; and, in every case, the warrantee, if he had paid money, got a credit for that money, as the price of other lands. They never stated the reason of vacating, or at least generally they did not ; and in two of the three cases in which we know of their being questioned in court, the title under them was held null, because there was proof that the warrantee did not consent. After Mr *Tilghman* became secretary of the land office, none were ever issued. He was a good lawyer. In his time, if a man had a warrant and survey returned, with or without a patent, and it was discovered that a prior appropriation would take away the land, such person on making this appear to the officers of the land office, executed a release on the back of the warrant in the land office, and got a credit for the money paid, with which he could take another warrant for any vacant land. And under the state, by the act of the 29th of March 1792, the same thing was done, with this difference, that the deputy surveyor certified that the land was taken by a prior right, and except for the purpose of obtaining a credit for the money paid, no act of the officers of the land office was ever necessary to give validity to a second warrant for land, before grant-ed illegally, either by the proprietaries or the state, unless it is necessary by this act. A warrant for lands purchased from the In-dians, was sometimes unexecuted until a new purchase from the Indians, and then surveyed and returned, and perhaps patented on lands in such new purchase. Such warrant, so executed, gave no title under the proprietors or under the state, and land embraced by it might be taken and held by a new warrant, calling for land in the purchase in which it lay, or by settlement without warrant. Since 1794 (until the act of 1814), no warrant could issue unless to one who had complied with the terms of settlement in the act of 1794 ; if one who had not made such settlement got a warrant and survey and return, all was void, and any actual settler could take the land, and no vacating warrant or other act of the state or its officers was necessary. See *Johnson* v. *Thompson*, 6 *Binn.* 68 ; *Baxter* v. *Baker*, 4 *Binn.* 413.

I proceed to notice the several clauses of the act of 3d April 1792, and of other acts bearing on this subject.

Section three directs that a warrant shall issue to any person who may have settled or improved, or to any person who is desirous to settle and improve, &c., the grantee to pay the purchase money and

[Campbell v. Galbreath.]

fees of office; and section ten gives a settler ten years to take out his warrant, and the time by subsequent laws is continued to this hour.

In section five is this provision, that the deputy surveyor shall not, by virtue of any warrant, *survey any tract of land that may have been actually settled and improved prior to the date of the entry of such warrant* with the deputy surveyor of the district, *except for the owner of such settlement and improvement.*

Section eight.　On payment of his fees, and on application of any person who has made an actual settlement and improvement on the lands, &c., the deputy surveyor shall survey and mark out the lines of the tract of land to which such person may, by conforming to the provisions of this act, become entitled by such settlement and improvement.

Section nine, after declaring what under this law shall constitute the settlement by it required, whether with or without a warrant, proceeds to say, " and in default of such actual settlement and residence, it shall and may be lawful to and for this commonwealth to issue *new warrants to other actual settlers,* for the said lands or any part thereof, *reciting the original warrants, and that actual settlement and residence have not been made in pursuance thereof,* &c." The grants are to be to actual settlers; not a word is said of *vacating* the prior warrant, no power is given to the officers of the land office to decide whether it has been avoided by want of compliance with the law, and in point of fact the warrants so granted, although called vacating warrants, recite the words of the act, and if any such warrant has declared the prior warrant to be *vacated,* it would, so far, be of no effect if the grantee of prior warrant could prove that he had complied with the terms.

If there could be any doubt under this act, I apprehend it is removed by subsequent laws.　Before any second warrant could issue, came the act of the 22d of April 1794, expressly relating to this tract of country.

Section one.　From and after the passing of this act, no application shall be received in the land office for any unimproved land within that part, &c.

Section two.　No warrant shall issue after the 15th of June next, for any land within that part of this commonwealth called the *New Purchase* (embracing the county in question), except in favour of persons claiming the same by virtue of some settlement and improvement thereon.　Then came the act of the 22d of September 1794.

Section one.　From and after the passing of this act, no application shall be received at the land office *for any lands within the commonwealth,* except for such lands whereon a settlement has been made, or hereafter shall be made, grain raised, and a person or persons residing thereon.　This has been repealed as to purchase 1768, and all prior purchases by the act of the 28th of March 1814, and as to that part of *New Purchase* east of Alleghany river by the act of the 10th of March 1817, but is in full force where the lands in ques-

N

[Campbell v. Galbreath.]

tion lie, i. e. north and west of Ohio, Alleghany, and Conewango. After the case of *The Commonwealth* v. *Coxe,* already cited, the legislature, anxious to settle the titles in this part of the state, and to terminate disputes which were defeating the objects of the law and ruining both parties, passed the act of the 2d of April 1802. This act, "to settle contending claims to lands within this commonwealth, &c." had not the desired effect. It was abused as unconstitutional by those who always abuse a law for that reason, when there is no other objection to it, and by those who had forgotten, or never knew that by the constitution of this state, "the legislature shall vest in said courts such other powers to grant relief in equity as shall be found necessary, and may from time to time enlarge or diminish those powers, or vest them in other courts, as they shall judge proper." Now that a dispute affects very many people, and can not be terminated at law without a multitude of suits, and great delay and expense, is a well known foundation of equity jurisdiction, more than once acted on by our legislature; as the act of 1799 appointing commissioners to settle disputes under Connecticut title, &c. To proceed: In this law, and under hopes that the tribunal organized by it would terminate all questions, it *is* enacted, section four, "in order to prevent the confusion that would arise from issuing different warrants for the same land, and to prevent law suits in future respecting grants from the land office, under the act of the 3d of April 1792, it is enacted, "that from and after the passing of this act, the secretary of the land office. *shall not grant any new warrant* for *land which* he has reason to believe hath been already taken up under a former warrant, but in all such cases he shall cause a duplicate copy of the application to be made, on which duplicate he shall write his name, with the day and year on which it was presented, and file the original in his office, and deliver the copy to the party applying; provided that on every application so to be made and filed, shall be certified on the oath or affirmation of one disinterested witness, that the person making such application, or in whose behalf such application is made, *is in actual possession of the land applied for,* and such certificate shall mention also the *time when such possession was taken;* and the application so filed in the secretary's office shall be entitled to the same force and effect, and the same priority in granting warrants to *actual settlers,* as though the warrants had been granted when the application was filed.

It must be observed, that this law relates expressly to warrants for lands for which a former warrant had issued. That they are here called *new warrants.* The term *vacating* warrant, as applied to the matter in question, had not been used by the legislature or by any court. That such application for such *new warrant* must be accompanied with proof of actual settlement and personal residence, and the date of such settlement must also be proved. That no time is prescribed within which a person residing on the land should apply, this is left as it stood under section ten of the act of the 3d of

[Campbell v. Galbreath.]

April 1792, enlarged by the act of the 26th of January 1802, which extends time to actual settlers, for taking warrants beyond ten years. This act has not been repealed, but was to continue in force two years. But the term vacating warrant was introduced in court soon after this, and certain decisions made, which I shall presently notice, and this occasioned the act of the 3d of April 1804, which enacts, section one, " all applications of. *actual settlers,* for lands lying north and west, &c., under the act of the 3d of April 1792, describing particularly the lands applied. for and filed with the secretary of the land office, vouching such other requisites as are provided for by the act of the 22d of September 1794, to prevent the issuing of any more applications or issuing any more warrants, &c., shall, for two years from and after the passing of this act, entitle the applicant, his heirs and assigns, to all the privileges that an original or *vacating warrant* would entitle them to, and on the trial of all suits brought or to be brought, between warrantees and actual settlers, concerning lands situate as aforesaid, the actual settler shall be permitted to plead and make proof of his *improvement* and *residence* as fully and with equal force and effect, as if such settler had obtained a vacating warrant, &c." The rest of the section is not mentioned in this case.

The former act had said in terms that the settler's title should be good, unless a better was shown, without a new warrant, and this one says the same thing, and that he shall be permitted to prove his settlement in court, in suits brought or to be brought. The applying this rule of evidence to suits brought, offended the courts, it was supposed to imply some censure on some decisions. Let us now see what these decisions were.

The actual settlers were as unreasonable as the warrant holders. The warrant holders did not even for one moment suppose they could hold the land without complying with the terms of the act. This is abundantly proved by the testimony adduced by themselves, in the case of *The Commonwealth* v. *Coxe.* They collected provisions, appointed agents, and offered to furnish provisions, and give a part of .a tract to any person who would settle on it ; but they went too far—they employed the same man to settle on and improve a dozen tracts. This was so palpable an evasion of the law, that the men thus employed left them and began to improve for themselves, and with equal absurdity to work on and claim several tracts for each man by improvement. The settlers went further, they threw away the proviso totally, and held the warrant void unless an actual personal resident settlement on it within two years from its date, although the Indian war had lasted all the two years ; and a man who went to the country first in 1798, would resist a warrant holder and tell him he had no title, would not permit him to comply with the proviso according to its terms, in short, would. not hear of the grantee having two years from the treaty at Greenville, in December 1795. This matter was settled by our supreme court as I have

stated, and in settling it, they gave a caution to those who had thus settled before the two years after the treaty had expired, though no such person was before them ; and I cannot find a word on the subject in the voluminous report of the argument of counsel.    The court had decided in terms, (4 *Dall.* 200) that although the warrantee had begun to make the settlement, and was driven therefrom, yet if he did not complete it after the peace within the time prescribed, according to their construction of the proviso, the condition of actual settlement and residence was not dispensed with or extinguished ; and in pages 201, 202, the court adhere to the construction, that in all events except the death of the party, the actual settlement and residence shall precede the vesting of the complete and absolute estate.    Yet in the conclusion of the opinion, not vesting is dropped, and the court say, "if the lands are forfeited in the eye of the law, though they have been fully paid for, *the breach of the condition can only be taken advantage of by the commonwealth, in the method prescribed by law.*    In no other circumstance than that of adding an opinion, on a point not discussed, to other points fully argued, could the court have said in one place the title did not vest, and in another, that if forfeited, the commonwealth alone could take advantage of it. The one was making it a condition precedent, the other subsequent ; I have endeavoured to show that the law of neither applied, that it was a legislative enactment, which, on that subject, controlled the common law and was alone the law.    The judge there cites, *Morris* v. *Neighman,* 4 *Dall.* 209, where some opinion was given against a settler who entered *before the two years had expired.*    See also some points exactly in the same situation, 4 *Dall.* 242.

The two next cases, *Shippen* v. *Aughenbaugh,* 4 *Yeates* 328, and *Jones* v. *Anderson,* 4 *Yeates* 569, were each of them cases in which the defendant had entered within the time allowed the warrantee to commence his actual settlement ; and in the first of them had actually resisted the warrantee and prevented him ; in the last the warrantee had never come near the land, but it was held that the defendant, settling down on the land before the two years from the 22d of December 1795, was resisting the warrantee, and preventing him from complying with the law, although such warrantee never crossed the Alleghany river in his life, or offered or even spoke of making a settlement on the land.    And the second defendant, although he had no application filed under either the act of 1802 or of the 3d of April 1804, could not give it in evidence, because filed after the suit was brought; nor could he give any evidence of his actual settlement and residence—in other words, that the act of the 3d of April 1804 was, so far as related to suits then brought, unconstitutional ; and the court say, in page 573, " the application and settlement would be evidence in a suit brought by the defendant after being turned out."

These two last are *nisi prius* cases.    The same questions arose and were argued in bank in *Hazard's Lessee* v. *Lowry,* 1 *Binn.* 166,

[Campbell v. Galbreath.]

and in *Wright and Porter* v. *Small*, 4 *Yeates* 562, and nothing like the opinions expressed in the two preceding cases is found ; though if adopted it would have settled both the cases : and the case of *Wright* v. *Small*, all the improvements of the defendant, made after the plaintiff's warrant, were given in evidence ; and further, the doctrine of improvements, their prosecution to actual residence, and their continuance as fully gone into.

In *Cosby* v. *Brown*, 2 *Binn.* 124, the first position of the judge in *Jones* v. *Anderson* is overruled, and much more, for it is there decided that although a man is actually resisted or actually driven from his settlement commenced, he cannot retire from the ground and say he has been prevented, and on this ground support an ejectment at any indefinite time afterwards short of twenty-one years. Such unreasonable delay may take place as to induce the younger settler, who had resisted another, to suppose that other to have relinquished his title, and in that case it would be unreasonable that the labour of years should be swept away.

In *Young* v. *Beatty*, 1 *Serg. & Rawle* 74, the residue of the decision in *Jones* v. *Anderson* was overruled, and even Judge *Yeates*, who decided *Jones* v. *Anderson*, agreed that residence of actual settlement on a tract granted by warrant and surveyed and returned, which settlement was commenced more than two years after *Wayne's* treaty, must be received in evidence ; he appears to adhere to his former opinion, to vacating warrants, and that the act of the 3d of April 1804 was null. But Chief Justice *Tilghman* and *Brackenridge* say, " there can be no doubt that a vacating warrant, *issued after the entry of the defendant, would confirm his title*, even supposing it not to be good without such warrant, *because the title, being in the commonwealth by the default of the plaintiff in not complying with the conditions of sale, may be granted to a third person at any time, and it is immaterial to the plaintiff whether such grant be made before the entry of such third person or after.* · In this case the plain and clear proposition is asserted, that unless the conditions expressed in the act of the 3d of April 1792 have been complied with, the title remains in the commonwealth, and is not in the warrantee who failed to comply. Our supreme court had twice decided the same way before in *The Commonwealth* v. *Coxe*, and *The Attorney-General* v. *Grantees.* Judge *Washington* had so decided in *Balfour* v. *Meade*, 4 *Dall.* 368, and before in *Huidekoper* v. *Douglas.* But the supreme court of the United States had decided otherwise in this last case, on appeal, 4 *Dall.* 392 ; but our supreme court never changed its decision, though some of the judges of that court, sitting in the circuit court, seemed to think themselves bound by the decision of the supreme court of the United States.

The opinion in *Young* v. *Beatty*, when duly considered, made an end of all question as to the necessity of a vacating warrant, as between an actual settler and an original warrantee who had not complied with the terms of the law. If, in the language of that and the other

cases mentioned, the title never passed to the warrantee (in the language of the act " no warrant shall vest any title," &c.), the title was in the commonwealth ; the warrantee who had not made the settlement, could not, after two years, call on any person in possession to show any title, unless he had some contract with such settler, or had been prevented by him within the two years ; and the people and the prófession thought the question at rest.

Seven years after came the case of *Skeen* v. *Pearce*, 7 *Serg: & Rawle* 303. It is, all things considered, the strangest case to be found in any law book. We are not even told whence it came ; no facts ; no argument of counsel ; no opinion of the court from which it came is to be found ; whether the point occurred in the cause, or was made by counsel in argument, we know not.

" The single point," says the judge, " whether any person, without obtaining a vacating warrant or filing an application, can acquire a title to lands by entering into, making a settlement, and procuring a survey, for which another person had previously obtained a warrant, and had a survey made under the act of the 3d of April 1792, but had not complied with the condition of settlement and residence required by the act ;" and this broad abstract question, not incumbered by circumstances or limited by time, is answered broadly, that he cannot.

No notice is taken of any decision of any court, as to the nature of the title acquired by the warrantee under that act. It is not reasoned on. It is assumed even without quoting the law. " For this condition broken, the state alone could enter." The term " actual settler," it said, " employed frequently in the various sections of the act, is not applied exclusively to him who had made and continued his settlement, but to one who is desirous to settle and improve, as distinguished from a warrantee." The words " actual settler" are used in the proviso as distinguished from warrantee, but must be construed to mean a person who had already commenced his settlement ; and again in section ten ; and can thus only mean one who has actually resided on the land ; and is not used in any other part of this act ; and neither in this or any other act, nor in court, nor in common parlance, was the term " actual settler" ever applied (except in this opinion) to any other than to one actually residing on, or, at least, working on a tract of land with intention to reside ; it cannot be applied to one who intends to settle ; it is used to distinguish one who has settled, from one who intends to settle.

What is said about an inquest of office, I shall only notice by saying, none was ever held, by common law, in this state, only when expressly directed by act of assembly : these are very different from inquest of office at common law ; and I have shown two cases decided by that same court, composed of the same judges, where land granted by the state, on warrants and money paid, and surveys returned, were decided invalid—in one case a subsequent warrant, and the other an actual settlement ; and no one thought, of what

[Campbell v. Galbreath.]

never existed, an inquest of office, or a vacating warrant to be issued by the officers of the commonwealth, who never issued one, and, if it is to be issued, have no power to issue one, or direct one : although filing an application is mentioned in the question, the conclusion to which the judge comes is, that a vacating warrant is absolutely necessary, in order to acquire any title to land granted over to a warrantee who never attempted to fulfil one of the terms prescribed.

No regard is paid to acts of assembly. By the act of September 1794, no application can be received, except for land on which a settlement shall have been made, grain raised, and a person residing thereon. By the act of the 2d of April 1802, no *new warrant,* that is, what is now called a vacating warrant, shall issue ; but he who wants one, shall file an application and proof of his actual settlement and residence on the land, and the time when his improvement began ; and this application shall have the same force and effect, and give the same priority in granting warrants, &c. But the courts, or rather some judges at nisi prius, would not allow of these effects in court. Then came the act of the 3d of April 1804, expressly referring to the act of 3d April 1792, and the act of the 22d September 1794, and directing that applications filed agreeably to these, stating actual, personal, resident settlement, grain raised, and a family thereon at the time of application, and proof when settlement commenced, should have the same effect as a vacating warrant. Now both these last acts were direct declarations that no vacating warrant was necessary ; that no adjudication of any officer of the state was necessary. Nay more, they were declarations that title to such land should be acquired by actual settlement, and that, so far from any new warrant being necessary, the state would not grant any such new or vacating warrant. Nay more, by the act of the 1st March 1811, such settler who has his survey returned, and the deputy surveyor is ordered to return it, is to get his patent on a warrant of acceptance and payment of the money, or giving a mortgage for it, without any vacating warrant ever issuing. But more ; by the act of 1792, the actual settler was allowed ten years in which to take his warrant and pay his money and interest : that time, by sundry acts, is still extended, but his interest still runs on. Then we come to this ; the laws say you may settle ; may, after settling, file your application, specifying the date of interest, but we grant no vacating warrant ; you may patent without such warrant ; and all this you may do now, or hereafter, as suits you ; and the case of *Skeen* v. *Pearce* says all this may be true ; but although you have settled agreeably to law ; are to pay interest from settlement ; are allowed time to apply and pay, and that time often extended, you are, all this time, liable to be turned off by a man who has no title— we know he has no title ; but the state must do a certain act—she has passed several laws, but they do not come up to the common law doctrine as it stood two centuries ago ; the acts of assembly quoted go for nothing ; you must move from your farm, and stay away until

the state repeals the act of 1802, and passes one restoring vacating warrants, and then you may bring suit and recover the land.

There may possibly have been a state of facts to which the doctrine laid down in *Skeen* v. *Pearce* may have been correctly applied ; as a general or universal rule, it is in the face of every enactment of the legislature ; it is, to the extent laid down, supported by no authority ; is inconsistent with *Young* v. *Beatty*, and, moreover, as a general rule, is expressly overruled in *Riddle* v. *Albert*, 14 *Serg. & Rawle* 841. In that case, the plaintiff claimed under a warrant, survey and return, but had made no settlement ; the defendant offered to show a settlement, in 1798 or 1799, and continued possession ever since, together with a warrant (not a vacating one) in 1818 ; a survey, return and patent ; this was rejected by the common pleas, on the authority of *Skeen* v. *Pearce*, and the judgment reversed, for this error, unanimously, by this court ; and surely, if the evidence could not avail the defendant, it ought not to have been received ; it would not be error to reject it. This court then say, " whether the defendant's title would have been good on the disclosure of all the circumstances of the case, is not now to be decided ; but, surely, he had a right to show that the legal title had been granted to him by the commonwealth. There was error, then, in rejecting the defendant's evidence, for which the judgment must be reversed."

There is another great mistake in *Skeen* v. *Pearce* ; it is there supposed, that on application of a settler for land previously granted by warrant, there is something like a trial and decision by the board of property and the officers of the land office. That it is done on examination of parties and witnesses, and a solemn adjudication, that the warrant before granted is null, and shall be vacated. Now all this is mistake of fact and of law. The owner of a warrant before granted, is not cited nor heard ; the only evidence by law, and the only evidence in fact, produced, is, the settler, along with his application and proof of settlement, &c., produces a survey by the deputy surveyor of the district, of the lands for which he applies, together with a certificate of said deputy surveyor, that the land (if the fact is so) was granted by a warrant, specifying the name of the warrantee and the date ; and that no settlement has been made by the owner of said warrant ; no witnesses are examined, no trial is had, no decision is made ;. the application is received and filed, and a new warrant, reciting the former warrant, and that the owner has failed to make the settlement, directed by law ; or, since 1811, a warrant of acceptance and patent issues at once ; no decree that the former warrant be vacated.

This new warrant or patent is at the risk of the grantee. If the owner of the former warrant contest it, the question, whether the first warrantee had right or no right, is to be tried in court, as all other questions of title are tried, and the facts stated in the new warrant must be found in court to be true. The certificate of the deputy surveyor before mentioned, is not conclusive ; it would, after great

[Campbell v. Galbreath.]

lapse of time, be *prima facie* evidence ; in a recent case, it would hardly be so.

On a careful examination of all the acts of assembly and all the decisions, I must conclude, that as a general rule, the case of *Skeen* v. *Pearce* is not law. And certainly not in this case, where the defendant had complied literally and strictly with the requisites prescribed by law.

I come now to the particular exceptions in this case.

The facts contained in the plaintiff's offer in the bill of exceptions : viz., that *Walker* and *Lodge* took out this and other warrants, put them into the hands of the deputy surveyor, procured surveys to be made, and paid the surveyor, &c., were evidence to prove that *Lodge* and *Walker* were the owners of this and the other warrants. To understand this, we must recollect, that at all times in Pennsylvania, it has been usual for a man to apply for warrants in the names of different persons, generally without those persons knowing any thing of such warrants, until called on to make a deed poll for a nominal consideration, to the person who applied and paid for the warrants. At times, rights were obtained on locations and applications, on which nothing except the officers' fees was paid at the time of obtaining them ; and after the lapse of some years doubts have arisen as to who really was the owner of such locations and warrants. As to locations, he who procured and proved the application to be made, has been proved by proving the handwriting in the original application on file, or by proving who obtained the survey and paid the surveyor. All this is also evidence to prove a right to a warrant ; but as to a warrant, there is better evidence. There was, from 1 July 1784 until the office closed in September 1794, a day book or blotter, called from the name of the chief clerk, in whose handwriting it is, *John Keble's* blotter ; in this is found, I believe, in many instances, the name of the person who actually paid for every warrant or list of warrants, in that time. Extracts from that book, under seal of the secretary of the land office, to whose office those books are transferred, are evidence, by act of 31st March 1823. The lands west of the Alleghany, were taken upon warrants paid for by Judge *Wilson, John Nicholson, R. Manis* and many others, none of whom were ever in or near that country, but they had agents who procured the surveys, and paid for them money furnished by the owner. The payment of surveying fees is then very equivocal evidence of ownership ; and when better evidence is within the power of the party claiming, is not produced, ought to weigh but little ; or rather, ought to have no more weight than secondary or circumstantial evidence has, when direct and positive evidence, in the power of the party, is withheld ; and so the court ought to have instructed the jury. There is no error in admitting what was proved ; but the law on that defective evidence was not correctly given to the jury, to whom it ought to have been left, whether there was sufficient evidence of ownership.

o

The second and third bills of exceptions were of declarations and acts of *Walker* and *Lodge*, and there was no error in admitting them; but whether these declarations and acts were of any validity or ought to have any effect in the cause, depended on whether the first was made out to the satisfaction of the jury, viz., that *Walker* and *Lodge* were the owners of these warrants. If the jury were satisfied that *Lodge* really paid for these warrants and owned them, then his declarations that *Walker* and *Probst* were equally interested with him, must go to the jury as evidence of some interest also in *Walker* and *Probst*; but if there was not evidence to satisfy the jury that *Lodge* was the owner, then his declarations that he was owner, and that the others were partners or agents of his, go for nothing. A man cannot make evidence for himself, his declarations are not evidence that he was owner, and of course not evidence that he was owner with others, or that these others had any right.

The fourth bill of exceptions. The declarations of *William Fell* were evidence that his son *G. W. Fell* began to improve under him. The effect of that improvement I shall notice hereafter.

The fifth bill is similar to the fourth, and subject to the same remarks.

The sixth bill of exceptions, is to a matter in which the court committed no error in rejecting the evidence ; but in which there was manifest error in the charge of the court, or rather of the associate judges, for the president did not concur.

In Pennsylvania an ejectment may be sustained by the *cestui que trust*, in his own name or in the name of his trustee, or the trustee may, and often does bring ejectment in pursuance of his duty to the real and beneficial owner. The person whose name is used by another, who takes out and pays for a warrant, is usually called a trustee for that other. This is often very incorrect, for the person whose name is used, has not a spark of interest either legal or equitable ; although at the trial no one knows whether there was in existence any such person as *Josiah Galbreath*, yet I know such a person well. If he never took out this warrant nor paid a cent for it in any way, he had not enough of interest to prevent an escheat if the owner died without heirs, and if he should bring an ejectment for these tracts as his own right, and at the trial it was proved that he did not apply for or pay for this tract of land, he could not recover against any person in possession, unless it was proved who applied and paid for it, and that the suit was for that person. If, as was the case here, *Josiah Galbreath* did not bring this suit, it must be shown at the trial who did bring it, and that it was brought by the person and for the person really the owner of that warrant. If any other than the real owner can sue in this name and recover, then every other person in the state may sue and recover, and that without showing any title. Now, our titles and proceedings in courts have been much censured, but are not so bad as that a man who has laboured on and improved land for twenty years and

[Campbell v. Galbreath.]

eleven months, can be evicted by any and every man in the state. It was thus a great error in the associate judges to say, that although it was not known for whose use, or at whose instance this suit was brought, and though it was admitted by the plaintiff's counsel it was not brought by or by the direction of *Josiah Galbreath,* yet there might and ought to be a recovery of the whole tract for whom it might concern.

We had a case in this court, some years ago, *Grey for the use of* ———— v. *Holdship.* The cause was tried without the counsel stating, and the court refused to compel them to state, for whose use it was brought, and by this means all the persons who would have pocketed the money were examined as witnesses, without objection, at the time they were offered. So in this case it seems the heir of *Walker* was examined. I do not know how counsel who respect themselves, can offer to try a cause in this way, and no court ought ever to suffer a recovery in such case. I mean where it is conceded the plaintiff on record has no interest, and where it is not known for whom the suit is brought.

The next portion of the charge, viz. as to the evidence of ownership, I have remarked on already.

The next part of the charge is, that a man who has obtained a warrant and survey in that district of country, although he has never been on the land until 1798, more than two years after the peace, has still a right to the land. That if on going to the land in 1798, he finds a settler on, who claims by actual settlement, and without a vacating warrant, the fact of such settler being on the land is itself a prevention, and excuses the owner of the warrant 'from settling according to the law; and that—although such actual settler procured a vacating warrant the 9th of January 1805, and a survey in March following, and a patent in 1806, accompanied with proof of continued actual residence from 1798 till the trial; and that such settler had no right to enter without a vacating warrant; and he must give way to the owner of the warrant. The supreme court of this state in *The Commonwealth* v. *Coxe,* 4 *Dall.* 170, decided, that a patent obtained by a warrantee who had not made the settlement required by the act, gave no title, unless accompanied by proof of the actual settlement; and again in *The Attorney-General* v. *The Grantees,* &c., 4 *Dall.* 237, decided, that no title vested in the grantee of a warrant, unless he, within two years of the peace, complied with the terms of the law, and continued his actual residence five years. No decision contrary to these was ever made by the supreme court of this state. The grantee of a warrant had a right to enter for the space of two years, to make his actual settlement according to law; if he did not enter for that purpose within two years of the peace, and was not prevented during those two years, his right of entry was gone, and no title vested in him. How a man can support an ejectment for a tract of land, who has no title to it vested in him, and no right of entry, I cannot conceive. To him it matters not how

the person in possession came there; whether the state can turn him out of possession or not, is of no consequence; he is safe against one who has neither title to the land, nor right of entry into it; this is settled, if any matter of the law of ejectment be settled.

The associate judges are mistaken in another matter. There has been no decision, that settling on land, for which a warrant has been granted, after two years from peace, nor that a settler resisting, after two years from peace a warrantee who had not improved within the two years, excuses the warrantee from complying with the terms of the law. It cannot do so. It is absurd to say, an act done in 1798 shall excuse a man for not settling on land in 1796 or 1797.

Even in *Jones* v. *Anderson,* 4 *Yeates* 569, which in more than one respect goes beyond the law, the decision is put expressly on the ground, that the supposed prevention occurred within the two years. "The warrantee," says that case, "was entitled to a period of two years after the ratification of the treaty at fort *Grenville,* 22d December 1795, wherein he might make his settlement. But instead of allowing this full interval of two years, the unlawful entry was made upon the land within the period of seven months, by those under whom the defendant claims: viz., in May 1796." And to remove all doubts on this subject, Judge *Yeates* himself says, in *Young* v. *Beatty,* that in all the cases where this point had been decided, the entry by the settler was within the two years.

Before I speak of the vacating warrant, I must notice the remaining part of this charge. The judges say, "the vacating warrant dated in 1805, was obtained on the representation, that the warantee had failed to comply with the law; but that failure having been occasioned by the defendant, or the man under whom he claims, amounts to such a misrepresentation as will make the vacating warrant void. For had the state of the facts been known to the officers of the land office, they would not have issued the vacating warrant." And again, "and this being the decision of this court, founded on former decisions of the supreme court, which have now become the law of the land, it leaves nothing for the jury to decide on this point, but to give a verdict for the plaintiff, if satisfied of the ownership of *Lodge* in the warrant of *Galbreath.*"

It is here that one of the *Fells,* and four of the family were examined for the plaintiff, says, that in *August* 1799 *Hamilton* and *G. W. Fell* met off the land, and *Hamilton* told *Fell* if he caught him on the land he would whip his guts out. This witness fixes the time with great positiveness. Now the four first witnesses of the plaintiff prove positively that almost all the work done on this tract by *G. W. Fell* was after August 1799, in the fall of that year; two of them mention October, and more than one of them swears that *G. W. Fell* worked some time there, and planted potatoes in the spring of 1800. *Hamilton* continued there until the winter of 1799 and 1800, and sold to *Campbell* who moved on, and no threats by him are intimated, though it was after he came that *G. W. Fell*

[Campbell v. Galbreath.]

ceased to do any thing there.   Now this might have induced the court to leave as facts to be decided by the jury, whether any threats were ever used, and whether a man who was not deterred from working by the threats, as long as he who threatened remained in the country, was frightened away by those threats after he knew *Hamilton* had left the country; and it is quite possible if so left by the court, the jury would have found one or both of them in favour of the defendant, and that the officers of the land office would have issued the vacating warrant if they had known every fact as proved at this trial.   But if this threat was made, and if *G. W. Fell* in consequence of it had never again gone upon the land, it would not, under the facts in this case, have made the plaintiff's case any better.   All right under the warrant had ceased—even the right to enter could, in *G. W. Fell*, be only that right which every person had to enter and settle on vacant land.   Even if he had begun first to improve and was driven off, he could not lie by for ever, see *Campbell* purchase and pay, and build a house and barn, and clear a farm, and take a warrant, get a survey and patent; and give no notice for half a lifetime.   In the case of *Cosby* v. *Brown*, 2 *Binn*. 124, *Brown* had built a house, cleared and fenced land, and sown it with grain in 1797, and went away in the winter, returned in the spring and found *Cosby* in his house, and was driven away by threats; he said he would resort to the law, but went away and stayed till 1805, when he brought ejectment, and his delay postponed him by the unanimous decision of the supreme court.   This decision was in 1809.

I had omitted *Patterson* v. *Cochran*, 1 *Binn*. 231, in the supreme court, where the right of the warrantee to recover in ejectment where he had not made any settlement, is expressly put on the ground of actual prevention, by a person who had settled within two years after the peace.

I am of opinion there are many errors for which this judgment should be reversed and a *venire de novo* awarded.

Judgment reversed, and a *venire facias de novo* awarded.